UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

_____
OSCO MOTORS COMPANY, LLC             :
dba OSCO MOTORS CORPORATION          :
400 University Court                 :
Blackwood, NJ  08012-3214            :
                                     :
    and                              :
                                     :
ENGINE DISTRIBUTORS, INC.            :
400 University Court                 :
Blackwood, NJ 08012                  :
        Plaintiffs,                  :    C.A. No.: 1:13-cv-00868-RGA
                                     :
                                     :
    v.                               :
                                     :
MARINE ACQUISITION CORP.             :
dba SEASTAR SOLUTIONS fka            :
TELEFLEX MARINE                      :
1 Sierra Place                       :
Litchfield, IL  62056                :
                                     :
    and                              :
                                     :
H.I.G. MIDDLE MARKET, LLC            :
600 Fifth Avenue, 24th Floor         :
New York, NY  10020                  :
                                     :
        Defendants.                  :
_____ :

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1. Plaintiff Osco Motors Company, LLC dba Osco Motors Corporation ("Osco"), is a corporation incorporated under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 400 University Court, Blackwood, Camden County, New Jersey 08012-3214.

1

2. Plaintiff Engine Distributors, Inc. ("EDI"), is a corporation incorporated under the laws of the state of New Jersey, with its principal place of business at 400 University Court, Blackwood, Camden County, New Jersey 08012-3214.

3. Defendant Marine Acquisition Corp. dba Seastar Solutions ("Seastar") is a corporation incorporated under the laws of the state of Delaware, with its principal place of business at 1 Sierra Place, Litchfield, Montgomery County, Illinois 62056.

4. Defendant, H.I.G. Middle Market, LLC ("H.I.G.") is a corporation incorporated under the laws of the state of Florida, with its principal place of business at 600 Fifth Avenue, 24th Floor, New York, New York 10020.

## JURISDICTION AND VENUE

5. The basis of jurisdiction is 28 U.S.C. § 1332 as diversity of citizenship exists between the parties and the amount in controversy is greater than $75,000.

6. Venue is proper in this District pursuant to a forum selection clause that places venue in the state of Delaware. The forum selection clause appears in the Confidentiality Agreement, the terms of which form a basis for this civil action, and provides that the parties "irrevocably consent and unconditionally consent to submit to the exclusive jurisdiction of the courts of the State of Delaware and of the United States of America located in the State of Delaware for any actions, suits or proceedings arising out of or relating to this agreement and the transactions contemplated hereby . . . ."

## FACTUAL BACKGROUND

7. Osco produces and distributes marine engines, manifolds, risers, and accessory parts.

8. Osco is a wholly owned subsidiary of EDI.

9. On January 31, 2005 Osco Motors Corporation entered into a purchase agreement with Osco Motors Company, LLC whereby Osco Motors Corporation transferred specified "Transferred Assets" to Osco Motors Company LLC.  Included in the delineated list of "Transferred Assets" was the name of the seller, Osco Motors Corporation.

10. Seastar is an end producer of finished marine boats and boating products.  Seastar regularly purchases products made by Osco and utilizes these products in its finished marine boats and boating products.  These products include manifolds produced by Osco.

11. Seastar operates and manages multiple marine brands including, *inter alia*, Sierra Engine and Drive Parts ("Sierra").

12. H.I.G. is a private equity and venture capital investment firm and Seastar's partner and equity sponsor.

13. On January 1, 2011, Osco entered into a manufacturing agreement with Quality Mark, Inc. ("QM") whereby QM would produce manifolds for Osco on an exclusive basis.

14. The manufacturing agreement contains a mediation and arbitration clause requiring disputes arising between the signatories to be resolved through mediation.

15. The manufacturing agreement also stated that if Osco was sold during the validity of the agreement, the manufacturing agreement would automatically renew under the same terms and conditions with the company that purchased Osco.

16. The manufacturing agreement was drafted by QM's President, Mark Ebbenga and identified Osco Motors Corporation, instead of Osco Motors Company, LLC, as one of the two contracting parties to the manufacturing agreement.

17. Osco's President, Glenn Cummins, Jr., indicated that Osco Motors Company was not Osco's proper business name.  Mr. Ebbenga informed him that this was not a problem and

3

that the contract was valid between the parties.  Mr. Cummins, Jr. signed the contract and added "Engine Distributors, Inc." under "Osco Motors Corporation" above his signature.

18.     The parties at all times intended for the manufacturing agreement to be a valid agreement between Osco Motors Company, LLC and QM.

19.     Pursuant to the terms of the manufacturing agreement, QM was not permitted to manufacture Osco products for any other entity except Osco or to sell Osco products directly to any entity except Osco.

20.     The terms of the manufacturing agreement also require all disputes related to the terms of the manufacturing agreement to be resolved by mediation and, if necessary, subsequent arbitration in Minneapolis, Minnesota.

21.     After QM and Osco entered into the manufacturing agreement, Osco and QM abided the contract and operated pursuant to its terms.

22.     Subsequently, Osco sold manifolds and other manufactured products to Seastar that were produced pursuant to the manufacturing agreement.

23.     In fact, Seastar regularly purchases Osco products and is one of the largest purchasers of Osco product.

24.     In early 2011, QM's President, Mr. Ebbenga, introduced a Seastar executive to Mr. Cummins, Jr., for the purposes of Seastar purchasing Osco.

25.     Seastar and H.I.G. began their investigation regarding the potential purchase of Osco under the terms of a Confidentiality Agreement entered into between Osco, EDI, Seastar, and H.I.G. on or about July 25, 2011.

26.     The obligations contained in the Confidentiality Agreement terminated on July 25, 2013.

27. The terms of the Confidentiality Agreement require that all disputes related to the Confidentiality Agreement to be resolved in Delaware.

28. The Confidentiality Agreement contemplated a "possible collaboration" between H.I.G. Middle Market, LLC and "EDI/Osco." Mr. Cummins, Jr., signed the agreement under the heading "[EDI/Osco]" and listed his title as President.

29. On or about September 11, 2012, Osco, together with Seastar and H.I.G., entered into a letter of intent whereby Osco agreed not to solicit or negotiate any other potential agreements regarding the sale of Osco with any other companies (the "Letter of Intent"). Seastar and H.I.G. agreed to conduct timely due diligence. Further, the content of the negotiations regarding H.I.G.'s and Seastar's acquisition were not to be disclosed to any third parties and the terms of the July 25, 2011 Confidentiality Agreement were incorporated within the Letter of Intent.

30. As further evidence of the progress of the negotiations between Osco, Seastar, and H.I.G., Seastar began directly placing orders for tooling of specific product from QM that Seastar would utilize after it purchased Osco. Upon information and belief, the tooling requested by Seastar was produced by QM.

31. In November 2012, Osco President, Glenn Cummins, Jr., met with a high-level H.I.G. representative and was informed by him that Osco was a "good fit" for H.I.G.'s portfolio of companies. The high-level H.I.G. executive informed Mr. Cummins Jr. that an offer to purchase Osco would be forthcoming.

32. In November and December of 2012, upon information and belief, QM President, Mark Ebbenga, had multiple meetings with Seastar's Vice President of Sales. Upon information

and belief, in these meetings Mr. Ebbenga and Seastar's Vice President of Sales discussed Seastar's and H.I.G.'s potential purchase of Osco.

33. During these conversations, upon information and belief, Mr. Ebbenga and Seastar's Vice President of Sales developed a plan whereby QM would sell Osco products, or products manufactured with the tooling jointly owned by Osco and QM, directly to Seastar without Osco's involvement.

34. During the course of their investigation regarding the potential purchase of Osco, Seastar and H.I.G. received significant amounts of information regarding, *inter alia*, Osco's pricing, customers, quantities shipped, and revenues.

35. Specifically, as a result of their investigation, Seastar and H.I.G. became aware of the manufacturing agreement entered into between Osco and QM and understood the close relationship between Osco and QM.

36. Further, Seastar and H.I.G. learned that, as a result of the manufacturing agreement between QM and Osco, QM had complete control over the Osco product that was being shipped to Osco customers and the tooling utilized to manufacture the product. As a result of this reality, QM could, if it decided to breach the terms of the extant manufacturing agreement between QM and Osco, ship Osco products, or products manufactured with the tooling jointly owned by Osco and QM, directly to any customer it saw fit.

37. After obtaining this information, upon information and belief, Seastar communicated directly with QM regarding the possibility of obtaining Osco manifolds directly from QM.

38. After this communication, Osco informed Seastar that all orders for Osco products must go through Osco and could not be transmitted through QM.

39. Following this communication, QM contacted Osco and requested approval from Osco to sell Osco products and manifolds directly to Seastar.

40. Osco, relying on the manufacturing agreement, denied QM's request to sell Osco product directly to Seastar.

41. In late January 2013, Osco and H.I.G. and Seastar entered into a second letter of intent whereby H.I.G. and Seastar would complete their due diligence. The letter was set to expire at the end of February 2013.

42. Sometime after February 2013, Seastar and H.I.G. discontinued their due diligence regarding the purchase of Osco and decided against purchasing Osco.

43. H.I.G. and Seastar informed Osco that they could not complete the purchase because QM would not abide the terms of the manufacturing agreement entered into between QM and Osco if H.I.G. and Seastar completed the purchase of Osco.

44. Subsequently, despite being explicitly prohibited by Osco from purchasing Osco product directly from QM, Seastar nonetheless purchased Osco products directly from QM. Seastar did not contemporaneously inform Osco of its purchases.

45. Upon information and belief, H.I.G. and Seastar have claimed ownership of tooling that is presently jointly owned by QM and Osco pursuant to the terms of the manufacturing agreement.

46. Upon information and belief, H.I.G. and Seastar have entered into arrangements with QM to control the production of Osco product and the use of the tooling that is presently controlled by QM but jointly owned by Osco and QM.

47. Osco believes, and therefore avers, that Seastar and H.I.G. have engaged in additional conduct, not yet discovered, that has caused significant damages to Osco and its relationships with suppliers and purchasers of Osco products.

48. Osco and QM are presently scheduled for arbitration in Minneapolis, Minnesota, on November 11-13, 2013.

49. As a direct and proximate result thereof, Osco has suffered significant damages.

## COUNT ONE
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### *Osco v. Seastar*

50. Osco hereby repeats and incorporates the preceding paragraphs, as though set forth at length herein.

51. Osco and QM were signatories of a manufacturing agreement that required QM to produce Osco products exclusively for Osco.

52. Pursuant to the terms of the extant manufacturing agreement, QM is prohibited from manufacturing or directly selling Osco products to any other company besides Osco.

53. Based on the due diligence conducted by Seastar and H.I.G. regarding the potential purchase of Osco, Seastar was aware and knew of the manufacturing agreement entered into between Osco and QM.

54. Further, Osco informed Seastar directly that all orders of Osco products must go through Osco.

55. Despite having this knowledge, upon information and belief, Seastar ordered Osco products directly from QM.

56. Subsequently, Seastar stopped ordering Osco products directly from Osco.

57.     Seastar's wrongful purchase of Osco product directly from QM was intended to disrupt, and did disrupt, Osco's relationship with its other existing customers, as well as damage its relationship with QM.

58.     The acts of Seastar were, and continue to be, wrongful, malicious, without privilege, and for the purpose of causing existing and anticipated customers to discontinue their existing business relations with Osco and/or prevent anticipated business relations with Osco.

59.     As a direct and proximate result of the actions of Seastar, Osco has suffered and will continue to suffer damages.

WHEREFORE, Plaintiff Osco demands judgment against Defendant Seastar in an amount in excess of Seventy-Five Thousand Dollars ($75,000) in addition to the loss of additional sales not yet known which discovery will reveal, plus costs, attorney's fees and interest, as well as such further relief as the court deems appropriate.

COUNT TWO
<u>INJUNCTIVE RELIEF</u>
*Osco v. Seastar*

60.     Osco hereby repeats and incorporates the preceding paragraphs, as though set forth at length herein.

61.     As set forth in greater detail above, Osco and QM entered into a legally binding and enforceable manufacturing agreement.

62.     Pursuant to the terms of the extant manufacturing agreement, QM is prohibited from manufacturing or directly selling Osco products to any other company besides Osco.

63.     Upon information and belief, Seastar has made orders directly to QM.

64.     Despite being prohibited from directly shipping Osco product to any party other than Osco, QM has shipped Osco product directly to Seastar.

65. As a direct and proximate result of Seastar's orders and subsequent conduct by QM, Osco has suffered and continues to suffer, immediate and irreparable harm.

66. Specifically, as a result of Seastar's decision to order Osco product directly from QM, Osco has suffered significant damages by losing the sale of Osco products to Seastar, one of Osco's largest customers.

67. Furthermore, as a result of Seastar's conduct, Osco's operating status and relationships with its customers and potential customers are in continuing peril and jeopardy.

68. Osco has no adequate remedy at law and only injunctive relief will provide an adequate remedy in this matter because the immediate and irreparable harm that Osco has already suffered and continues to suffer cannot be compensated by monetary damages.

69. Osco has repeatedly and consistently demanded that Seastar cease and desist from ordering Osco products directly from QM.

70. Seastar will not suffer appreciable injury as a result of the imposition of the requested injunction since Seastar will be merely be restrained from what it is unable to do based on the manufacturing agreement between QM and Osco.

WHEREFORE, Osco respectfully requests that this Court enter a preliminary injunction against Defendant Seastar, its agents, servants, employees, attorneys, and all persons acting in concert with Seastar or Sierra, enjoining it from ordering Osco products directly from QM.

COUNT THREE
<u>BREACH OF CONTRACT</u>
*Osco v. Seastar*
*Osco v. H.I.G.*

71. Osco hereby repeats and incorporates the preceding paragraphs, as though set forth at length herein.

72. Osco, Seastar, and H.I.G. entered into a Confidentiality Agreement, contemplating a "potential collaboration," whereby the parties agreed to not disclose the negotiations of the potential sale and to keep exchanged information confidential.

73. Additionally, Osco provided Seastar and H.I.G. a period of time whereby Osco would not solicit offers or negotiate with any third parties regarding the sale of Osco.

74. While obtaining information exchanged during the negotiations to purchase Osco, Seastar and H.I.G. became aware that QM had complete control over the Osco product that was being shipped to Seastar as well as to other Osco customers.

75. Seastar and H.I.G. discussed this information with QM in attempt to create a plan to circumvent the extant manufacturing agreement entered into between QM and Osco.

76. Pursuant to the terms of the Confidentiality Agreement, Seastar and H.I.G. agreed to keep confidential all materials obtained while evaluating their potential purchase of Osco.

77. Seastar and H.I.G. have breached, and continue to breach, the terms of the parties' Confidentiality Agreement, as more fully described herein above, and in doing so have disclosed confidential information Osco provided to Seastar and H.I.G. in contemplation of their potential purchase of Osco as confidential.

78. Further, Seastar and H.I.G. used the information provided by Osco under the protections of the Confidentiality Agreement for their own advantages and to the detriment of Osco.

79. As a result of said actions, Osco has suffered significant monetary damages, plus the loss of additional sales not yet known which discovery will reveal.

WHEREFORE, Plaintiff Osco demands judgment against Defendant Seastar and H.I.G. Middle Market, LLC in an amount in excess of Seventy-Five Thousand Dollars ($75,000) in

addition to the loss of additional sales not yet known which discovery will reveal, plus costs, attorney's fees and interest, as well as such further relief as the court deems appropriate.

## COUNT FOUR
## BREACH OF THE DUTY TO NEGOTIATE IN GOOD FAITH
*Osco v. Seastar*
*Osco v. H.I.G.*

80. Osco hereby repeats and incorporates the preceding paragraphs, as though set forth at length herein.

81. Osco, Seastar, and H.I.G. entered into the Letter of Intent whereby the parties agreed not to disclose the negotiations of the potential sale and to keep exchanged information confidential.

82. Additionally, Osco agreed to provide Seastar and H.I.G. a period whereby Osco would not solicit offers or negotiate with any third parties regarding the sale of Osco.

83. Seastar and H.I.G. agreed to conduct their due diligence in a timely fashion.

84. Subsequently, Osco had been told by a high level H.I.G. representative that Osco was a good fit for H.I.G.'s portfolio.

85. While obtaining information exchanged during the negotiations to purchase Osco, Seastar and H.I.G. became aware that QM had complete control over the Osco product that was being shipped to Seastar as well as other Osco customers.

86. As a result of this reality, QM could, if it decided to breach the terms of the extant manufacturing agreement between QM and Osco, ship Osco product directly to any customer it saw fit.

87. Based on this information, upon information and belief, Seastar and H.I.G. determined that Seastar could obtain Osco product directly from QM without purchasing Osco.

88. Subsequently, Seastar and H.I.G. discontinued their negotiations to purchase Osco.

89. As a result of said actions, Osco has suffered significant monetary damages based on H.I.G.'s and Seastar's failure to purchase Osco, plus additional damages not yet known which discovery will reveal.

WHEREFORE, Plaintiff Osco demands judgment against Defendant Seastar Solutions and H.I.G. Middle Market, LLC in an amount in excess of Seventy-Five Thousand Dollars ($75,000) in addition to the loss of additional sales not yet known which discovery will reveal, plus costs, attorney's fees and interest, as well as such further relief as the court deems appropriate.

## JURY DEMAND

A jury trial is hereby demanded.

Respectfully Submitted,

**TYBOUT REDFEARN & PELL**

Dated: 8/6/13

/s/ Seth J. Reidenberg_____
**Seth J. Reidenberg, Esquire (#3657)**
P.O. Box 2092
750 Shipyard Drive, Suite 400
Wilmington, DE 19899
302-658-6901
sreidenberg@trplaw.com
*Attorney for Plaintiff Osco Motors Company, LLC*