**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

OSCO MOTORS COMPANY, LLC, d/b/a    :
OSCO MOTORS CORPORATION, and       :
ENGINE DISTRIBUTORS, INC.          :
                                   :
              Plaintiffs,          :
                                   :
       v.                          :        C. A. No. 13-868-RGA-MPT
                                   :
MARINE ACQUISITION CORP. d/b/a     :
SEASTAR SOLUTIONS f/k/a TELEFLEX   :
MARINE and H.I.G. MIDDLE MARKET,   :
LLC,                               :
                                   :
              Defendants.          :


## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

On May 17, 2013, plaintiff, Osco Motors Company, LLC ("Osco") filed its original

complaint against defendants Marine Acquisition Corp. d/b/a Seastar Solutions f/k/a

Teleflex Marine ("Seastar") and H.I.G. Middle Market, LLC ("HIG") (collectively

"defendants").[1]  The complaint alleged four causes of action:  (1) tortious interference

with contractual relations; (2) injunctive relief; (3) breach of contract; and (4) breach of

the duty to negotiate in good faith.[2]

On July 22, 2013, defendants filed a motion to dismiss.[3]  Defendants moved to

dismiss the claim of tortious interference with contractual relations pursuant to Federal

Rule of Civil Procedure ("FED. R. CIV. P.") 12(b)(1) for lack of standing, and the

---

[1] D.I. 1.
[2] *Id.*
[3] D.I. 12.

remaining three claims pursuant to FED. R. CIV. P 12(b)(6) for failure to state a claim.[4]

In response, on August 6, 2013, Osco filed an amended complaint adding Osco Motors

Corporation, the name Osco does business as, and Engine Distributors, Inc. ("EDI")

(collectively "plaintiffs"), Osco's parent company, as plaintiffs.[5]  After these additions,

defendants withdrew their FED. R. CIV. P. 12(b)(1) motion to dismiss for lack of standing

as to the first count.[6]

Defendants now move to dismiss the second, third, and fourth counts of the

amended complaint pursuant to FED. R. CIV. P. 12(b)(6) for failure to state a claim.[7]

Defendants also move to stay the proceedings pending the resolution of an arbitration

between plaintiffs and non-party Quality Mark, Inc. ("QM"), which is tentatively

scheduled on January 13, 2014.[8]  Both issues are presently before the court.

## II.    BACKGROUND

### A.    Parties

Osco produces and distributes marine engines, manifolds, risers, and accessory

parts.[9]  Osco is a wholly-owned subsidiary of EDI.[10]  Seastar is an end producer of

finished marine boats and boating products.[11]  Seastar regularly purchases products

made by Osco and utilizes these products in its finished marine boats and boating

---

[4] *Id.*
[5] D.I. 19.
[6] D.I. 20.
[7] D.I. 21.
[8] *Id.*
[9] D.I. 19 ¶ 7.
[10] *Id.* ¶ 8.
[11] *Id.* ¶ 10.

products.[12]  These products include manifolds produced by Osco.[13]  HIG is a private

equity and venture capital investment firm, as well as Seastar's partner and equity

sponsor.[14]

### B.    Factual Background

On January 1, 2011, Osco entered into a Manufacturing Agreement[15] with QM,

where QM would produce manifolds for Osco on an exclusive basis.[16]  Pursuant to the

Manufacturing Agreement, QM was not permitted to manufacture Osco products for any

entity other than Osco, or to sell Osco products directly to any other entity.[17]

Additionally, under the Manufacturing Agreement, if Osco was sold during the life of the

agreement, the Manufacturing Agreement would automatically renew under the same

terms and conditions with the company that purchased Osco.[18]  Osco sold manifolds

and other manufactured products to Seastar, which QM produced for Osco pursuant to

the Manufacturing Agreement.[19]

In early 2011, Seastar and HIG inquired about purchasing Osco.[20]  As part of this

inquiry, Seastar, HIG, Osco, and EDI entered into a Confidentiality Agreement[21] on or

about July 25, 2011.[22]  The Confidentiality Agreement contemplated a "possible

---

[12] *Id.*
[13] *Id.*
[14] *Id.* ¶ 12.
[15] D.I. 23, Ex. A.
[16] D.I. 19 ¶ 13.
[17] *Id.* ¶ 19; D.I. 23, Ex. A § 2.2.
[18] D.I. 19 ¶ 15; D.I. 23, Ex. A § 5.1.
[19] D.I. 19 ¶¶ 21-22.
[20] *Id.* ¶ 24.
[21] D.I. 23, Ex. B.
[22] D.I. 19 ¶ 25.

collaboration" between HIG and plaintiffs.[23]  The Confidentiality Agreement was signed by the HIG's President, Glenn Cummins Jr.[24]

On or about September 11, 2012, Osco, together with Seastar and HIG, entered into a Letter of Intent,[25] whereby Osco agreed not to solicit or negotiate any other potential agreements regarding the sale of Osco with any other company.[26]  Defendants agreed to conduct timely due diligence regarding the transaction.[27]  The content of the negotiations regarding defendants' acquisition were not to be disclosed to any third parties, and the terms of the Confidentiality Agreement were incorporated into the Letter of Intent.[28]  In late January 2013, Osco and defendants entered into a second Letter of Intent to extend the exclusivity period whereby defendants would complete their due diligence.[29]

During the course of defendants' due diligence and investigation regarding the potential purchase of Osco, they received information regarding Osco's pricing, customers, quantities shipped, and revenues.[30]  As a result of their investigation, defendants were provided the Manufacturing Agreement entered into between Osco and QM and became aware of the close relationship between the same.[31]  Additionally, defendants learned from the Manufacturing Agreement that QM had complete control

---

[23] *Id.* ¶ 28; D.I. 23, Ex. B.
[24] *Id.*
[25] D.I. 23, Ex. C.
[26] D.I. 19 ¶ 29; D.I. 23, Ex. C.
[27] D.I. 19 ¶ 29.
[28] *Id.*
[29] *Id.* ¶ 41.
[30] *Id.* ¶ 34.
[31] *Id.* ¶ 35.

over the Osco product that was being shipped to Osco customers, and the tooling

utilized to manufacture the product.[32]  As a result of this arrangement, QM could breach

the terms of the Manufacturing Agreement, and ship Osco products, or products

manufactured with the tooling jointly owned by Osco and QM, directly to any customer.[33]

Once Seastar obtained this information, it communicated with QM about obtaining Osco

manifolds directly from QM.[34]

        In November and December 2012, QM's President, Mark Ebbenga, had multiple

meetings with Seastar's Vice President of Sales to discuss the possible purchase of

Osco.[35]  During these meetings, Ebbenga and Seastar's Vice President of Sales agreed

QM would sell Osco products directly to Seastar without Osco's involvement.[36]  As a

result of these conversations, QM contacted Osco for its approval to sell Osco products

and manifolds directly to Seastar.[37]  Osco refused to grant permission pursuant to the

Manufacturing Agreement, and informed Seastar all orders for Osco products must go

through Osco and could not be transmitted through QM.[38]

        Nonetheless, Seastar purchased Osco products directly from QM.[39]  Defendants

did not inform Osco of any direct purchase.[40]  Defendants now claim ownership of

tooling that is presently jointly owned by QM and Osco under the Manufacturing

---

[32] *Id.* ¶ 36.
[33] D.I. 19 ¶ 36.
[34] *Id.* ¶ 37.
[35] *Id.* ¶ 32.
[36] *Id.* ¶ 33.
[37] *Id.* ¶ 39.
[38] *Id.* ¶ 38.
[39] D.I. 19 ¶ 44.
[40] *Id.*

Agreement,[41] and have entered into agreements with QM to control the production of Osco products and to use the Osco tooling, within QM's possession.[42]

As a result of defendants' conduct, plaintiffs initiated the instant action alleging tortious interference with contractual relations, injunctive relief, breach of contract, and breach of the duty to negotiate in good faith.[43]  Shortly thereafter, plaintiffs amended the complaint to change the names of the parties in response to defendants' motion to dismiss for lack of standing.[44]  Subsequently, defendants moved to dismiss the second, third, and fourth counts of the amended complaint pursuant to FED. R. CIV. P. 12(b)(6) for failure to state a claim,[45] and to stay the proceedings pending the resolution of an arbitration scheduled between plaintiffs and non-party QM.[46]

### C.    Pending Arbitration Between Osco & QM

The Manufacturing Agreement contains a mediation and arbitration clause requiring disputes arising from the signatories to be resolved through alternative dispute resolution.[47]  On May 30, 2013, Osco filed a demand for arbitration against QM before the American Arbitration Association ("AAA").[48]  On June 12, 2013, QM filed its own demand for arbitration against Osco, EDI, and Glenn Cummings, Jr., EDI's Chief Executive Officer and controlling shareholder.[49]  The arbitration was originally scheduled

---

[41] *Id.* ¶ 45.
[42] *Id.* ¶ 46.
[43] D.I. 1.
[44] D.I. 19.
[45] D.I. 21.
[46] *Id.*
[47] D.I. 19 ¶ 20; D.I. 23, Ex. A § 10.11.
[48] D.I. 23, Ex. E.
[49] *Id.*, Ex. F.

6

for November 11-13, 2013, but was continued to January 13-15, 2014.[50]

## III.   DISCUSSION

### A.     12(b)(6) Motion to Dismiss Standard

FED. R. CIV. P. 12(b)(6) governs a motion to dismiss a complaint for failure to

state a claim upon which relief can be granted.[51]  The purpose of a motion under Rule

12(b)(6) is to test the sufficiency of the complaint, not to resolve disputed facts or decide

the merits of the case.[52]  "The issue is not whether a plaintiff will ultimately prevail, but

whether the claimant is entitled to offer evidence to support the claims."[53]  A motion to

dismiss may be granted only if, after "accepting all well-pleaded allegations in the

complaint as true, and viewing them in the light most favorable to the plaintiff, plaintiff is

not entitled to relief."[54]  While the court draws all reasonable factual inferences in the

light most favorable to a plaintiff, it rejects unsupported allegations, "bald assertions,"

and "legal conclusions."[55]

---

[50] D.I. 22 at 9; D.I. 29 at 9, 20.

[51] FED. R. CIV. P. 12(b)(6).

[52] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

[53] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotations and citations omitted); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007) ("[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder.").

[54] *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (citing *Burlington*, 114 F.3d at 1420).

[55] *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (citations omitted); *see also Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997) (citations omitted) (rejecting "unsupported conclusions and unwarranted inferences"); *see generally Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983) ("It is not . . . proper to assume [plaintiff] can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged.").

To survive a motion to dismiss, a plaintiff's factual allegations must be sufficient to "raise a right to relief above the speculative level . . . ."[56]  Plaintiffs are therefore required to provide the grounds of their entitlement to relief beyond mere labels and conclusions.[57]  Although heightened fact pleading is not required, "enough facts to state a claim to relief that is plausible on its face" must be alleged.[58]  A claim has facial plausibility when a plaintiff pleads factual content sufficient for the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.[59]  Once stated adequately, a claim may be supported by showing any set of facts consistent with the allegations in the complaint.[60]  Courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record when reviewing a motion to dismiss.[61]

## B.      12(d) Matters Outside the Pleading Standard

FED. R. CIV. P. 12(d) provides "[i]f, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must

---

[56] *Twombly*, 550 U.S. at 555 (citations omitted); *see also Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (citing *Twombly*, 550 U.S. at 555).

[57] *See Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

[58] *Twombly*, 550 U.S. at 570; *see also Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) ("In its general discussion, the Supreme Court explained that the concept of a 'showing' requires only notice of a claim and its grounds, and distinguished such a showing from 'a pleader's bare averment that he wants relief and is entitled to it.'") (quoting *Twombly*, 550 U.S. at 555 n.3).

[59] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556).

[60] *Twombly*, 550 U.S. at 563 (citations omitted).

[61] *See, e.g.*, *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted).

be treated as one for summary judgment under Rule 56."[62]  However, "a document integral to or explicitly relied upon in the complaint may be considered [on a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6)] without converting the motion into one for summary judgment."[63]  A document will be considered integral to the complaint where the plaintiff's claim cannot be evaluated without some reference to that document.[64]

## IV.   ANALYSIS

### A.   Motion to Stay Proceedings

As an initial matter, the court will address defendants' argument to stay the proceedings pending arbitration between plaintiffs and QM.[65]  "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with the economy of time and effort for itself, for counsel, and for litigants.  How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance."[66]  "[I]f there is even a fair possibility that the stay for which [the movant] prays will work damage to some one else," "the [movant] for a stay must make out a clear case of hardship or inequity in being required to go forward."[67]  "Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will

---

[62] FED. R. CIV. P. 12(d).
[63] *See, e.g.*, *Angstadt v. Midd-West School District*, 377 F.3d 338, 342 (3d Cir. 2004) (quoting *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 1250, 1261 (3d Cir. 2002) (internal quotation marks and citations omitted) (emphasis deleted)).
[64] *See id.*
[65] D.I. 22 at 17-20.
[66] *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936).
[67] *Id.* at 255.

define the rights of both."[68]

Defendants fail to meet their burden to stay the proceedings.  They argument is three-fold.  First, they contend this matter would only be stayed a few months because arbitration is "imminent."[69]  At the time of defendants' motion, the arbitration was scheduled for November 2013,[70] which has since been continued until January 13, 2014.[71]  Second, defendants maintain a stay is appropriate because the instant action is in its initial stages–defendants have not yet answered the amended complaint, and no discovery has been exchanged.[72]  Third, they argue a stay has the potential to eliminate or narrow plaintiffs' causes of action because the arbitration between plaintiffs and QM addresses whether QM breached the Manufacturing Agreement when it sold Osco products directly to Seastar.[73]  Defendants aver the arbitration effects plaintiffs' tortious interference claim in the instant matter.[74]

None of these arguments demonstrate any type of hardship to defendants, which is required to stay the instant action.[75]  Conversely, there is, at a minimum, a fair possibility plaintiffs situation would be negatively affected by delaying the present litigation.  It is unclear how the findings on arbitration may affect issues in the instant matter, specifically Seastar's liability.  Although arbitration is presently scheduled for January 2014, it was rescheduled, resulting in a delay of two months, and when a

---

[68] *Id.*
[69] D.I. 22 at 18.
[70] *Id.*
[71] D.I. 29 at 20.
[72] D.I. 22 at 18.
[73] *Id.* at 18-19.
[74] *Id.*
[75] *See Landis*, 299 U.S. at 255.

decision will be rendered in not certain.  Arbitration will not fully address Seastar's liability in this matter.  Therefore, since defendants have not demonstrated a hardship to overcome plaintiffs' right to pursue litigation, their motion to stay should be denied.

### B.   Documents Outside Complaint

The court finds the Manufacturing Agreement, Confidentiality Agreement, and the Letters of Intent are integral to and explicitly relied upon in the amended complaint; therefore, it may consider these documents in analyzing plaintiffs' allegations under the standards of Rule 12(b)(6).

Plaintiffs' second cause of action, for injunctive relief against Seastar, explicitly relies on the existence of the Manufacturing Agreement between Osco and QM, and QM's alleged breach of the Agreement.[76]  Therefore, the Manufacturing Agreement is integral to and explicitly relied upon in the amended complaint.

Additionally, plaintiffs' third cause of action, for breach of contract against Seastar and HIG, relies on the existence of the Confidentiality Agreement among Osco, Seastar, and HIG.[77]  Not only does the amended complaint reference this Agreement, it quotes therefrom.[78]  Therefore, the Confidentiality Agreement is integral to and expressly focused upon in the amended complaint.

Plaintiffs' fourth cause of action, for breach of the duty to negotiate in good faith against Seastar and HIG, relies on the Letters of Intent between Osco, Seastar, and

---

[76] *See* D.I. 19 ¶¶ 61-70.
[77] *See id.* ¶¶ 72-79.
[78] *See id.* ¶ 72 (quoting specific language–"potential collaboration"–found in the Confidentiality Agreement).

HIG.[79]  Therefore, the Letters of Intent are referenced within and specifically relied upon in the amended complaint.

Lastly, while plaintiffs reference the arbitration scheduled with QM in the factual background of the amended complaint,[80] they do not *rely* on the arbitration proceeding to support liability under their claims.[81]  Nor is the arbitration proceeding integral to the amended complaint because plaintiffs' claim under the present motion can be evaluated without reference to the proceeding.  As a result, materials from that proceeding will not be considered in analyzing defendants' motion to dismiss.

## C.    Defendants' Motion to Dismiss

### 1.    Count Two–Injunctive Relief

In Count Two, plaintiffs request Seastar be enjoined from ordering Osco products directly from QM.[82]  In determining whether a preliminary injunction should be issued, a court considers the following factors:

> (1) the likelihood that the moving party will succeed on the merits;
> (2) the extent to which the moving party will suffer irreparable harm without injunctive relief;
> (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and
> (4) the public interest.[83]

The Third Circuit requires a party seeking an injunction must meet all four criteria, as "[a] plaintiff's failure to establish any element in its favor renders a preliminary injunction

---

[79] *See id.* ¶¶ 81-89.
[80] *Id.* ¶ 48.
[81] *See id.* ¶¶ 50-89.
[82] D.I. 19 ¶¶ 60-70.
[83] *See, e.g., Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 556 (3d Cir. 2009).

inappropriate."[84]  The burden of proving the first two elements is on the party moving for

an injunction.[85]  The Third Circuit has long "recognized that the grant of injunctive relief

is an 'extraordinary remedy, which should be granted only in limited circumstances.'"[86]

The Third Circuit "has repeatedly insisted that the preliminary injunction device

should not be exercised unless the moving party shows that it specifically and

personally risks irreparable harm.'"[87]  The Third Circuit has "long held an injury

measured in solely monetary terms cannot constitute irreparable harm."[88]  Therefore, an

injunction will not be granted where the claimed injury constitutes a loss of money

because it is "a loss capable of recoupment in a proper action at law."[89]  In *Instant*

*Freight Co. v. C.F. Air Flight, Inc.*, the Third Circuit reversed the district court's grant of

an injunction where the plaintiff argued if an injunction was not issued to prevent a

breach of the parties' contract, its "business would be completely destroyed, . . . and its

goodwill and business reputation [would] be ruined" because eighty percent of its

business was devoted to the defendant.[90]  The Third Circuit added, despite the

defendant accounting for a substantial portion of plaintiff's business, no financial

---

[84] *Conestoga Wood Specialties Corp. v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 724 F.3d 377, 382 (3d Cir. 2013) (quoting *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)).

[85] *See Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.1994).

[86] *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989) (quoting *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988)).

[87] *Liberty Lincoln-Mercury, Inc.*, 562 F.3d at 557 (quoting *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000)).

[88] *Liberty Lincoln-Mercury, Inc.*, 562 F.3d at 557.

[89] *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1145 (3d Cir. 1982) ("[W]e have never upheld an injunction where the claimed injury constituted a loss of money, a loss capable of recoupment in a proper action at law.").

[90] *Instant Air Freight Co.*, 882 F.2d at 798, 801.

statements or projections were provided to support the argument that plaintiff's business

would be "completely destroyed," because the plaintiff would "still maintain[ ] twenty

percent of its business."[91]

Here, plaintiffs argue they suffered irreparable harm in the form of lost business

relationships and goodwill, which cannot be remedied by monetary damages.[92]  As

addressed in *Instant Air*, however, merely alleging loss of goodwill and business

reputation is not sufficient to satisfy the irreparable harm prong for injunctive relief.[93]

Even assuming plaintiffs' "relationships with its customers and potential customers are

in continuing peril and jeopardy,"[94] as plead in their amended complaint, the harm can

be cured through monetary relief.

Assuming arguendo, loss of goodwill and harm to their business reputation is

adequate to show irreparable harm,[95] plaintiffs have not alleged sufficient facts to

support a loss of goodwill or harm to their business reputation.  In *Instant Air*, the court

denied injunctive relief where the defendant constituted eighty percent of the plaintiff's

business.[96]  Similarly, plaintiffs in the present matter allege they "suffered significant

---

[91] *Id.* at 802.

[92] D.I. 29 at 13.

[93] *See Instant Air Freight Co.*, 883 F.2d at 801.

[94] D.I. 19 ¶ 67.

[95] Plaintiffs rely on *L&W Ins., Inc. v. Harrington*, No. 2730, 2007 WL 2753006 (Del. Ch. Mar. 12, 2007), an unreported case from the Delaware Court of Chancery, to argue the protections of substantial business relationships and goodwill are legitimate business interests whose impairment gives rise to irreparable harm.  D.I. 29 at 13.  However, the *L&W* court stated "[t]he protection of substantial business relationships and goodwill are legitimate business interests whose impairment *may* give rise to irreparable harm."  *L&W Ins., Inc.*, 2007 WL 2753006, at *11 (emphasis added).  Read in context, the court found that despite the plaintiffs' loss of customers, they failed to prove irreparably harm by suffering a non-monetary injury.  *Id.*

[96] *See Instant Air Freight Co.*, 883 F.2d at 802.

damages by losing the sale of Osco products to Seastar, one of Osco's largest customers."[97]  Furthermore, plaintiffs do not allege a loss of "goodwill" anywhere in their amended complaint.[98]  Indeed, the mention of any loss of goodwill is proffered for the first time in their opposition brief.[99]  Thus, applying the standards of Rule 12(b)(6), plaintiffs fail to allege a claim for injunctive relief because the loss of a major customer, goodwill, and harm to a company's business reputation do not constitute irreparable, non-monetary harm for injunctive relief.[100]  Accordingly, defendants' motion to dismiss Count Two for injunctive relief of the amended complaint should be granted.

### 2.    *Count Three–Breach of Contract*

Under Count Three, plaintiffs allege Seastar and HIG breached the Confidentiality Agreement, where the parties agreed to keep exchanged information confidential.[101]  Under Delaware law, to survive a motion to dismiss for a breach of contract claim, the plaintiff must demonstrate:  (1) the existence of a contract; (2) the breach of an obligation imposed by that contract; and (3) damages resulting from the breach.[102]  Defendants concede the existence of the Confidentiality Agreement; however, they argue plaintiffs have failed to demonstrate a breach of an obligation imposed by the Confidentiality Agreement, because defendants *used* the information obtained from the Confidentiality Agreement, rather than *disclosing* such information to

---

[97] D.I. 19 ¶ 66.
[98] *See* D.I. 19.
[99] *See* D.I. 29 at 13.
[100] *See Instant Air Freight Co.*, 883 F.3d at 801.
[101] D.I. 19 ¶¶ 71-79.
[102] *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *see also Miller v. Truelink, Inc.*, 533 F. Supp. 2d 479, 487-88 (D. Del. 2008).

QM; and they did not disclose any *confidential* information.[103]   Additionally, defendants

argue plaintiffs have not sufficiently plead damages resulting from the breach.[104]   The

court disagrees; therefore, defendants' motion to dismiss Count Three should be

denied.

a.   Use v. Disclosure

The first issue is whether the language of the Confidentiality Agreement

prohibited both the use and disclosure of confidential, nonpublic information or merely

its disclosure.   "A confidentiality agreement . . . is intended and structured to prevent a

contracting party from using and disclosing the other party's confidential, nonpublic

information except as permitted by the agreement."[105]   Additionally, "[w]hen interpreting

a contract, the role of a court is to effectuate the parties' intent."[106]   Absent textual

ambiguity, Delaware courts fulfill that role by according to contractual language the

ordinary meaning that "a reasonable person in the position of the parties would have

thought the language of the contract means."[107]

In the instant matter, Osco provided certain information concerning its business,

financial condition, and operations (the "Evaluation Material") to HIG and its

representatives in connection with the potential transaction.[108]   Under the Confidentiality

---

[103] D.I. 22 at 13-14.

[104] *Id.* at 14.

[105] *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1219 (Del. 2012).   *See also* 1 LOU R. KLING & EILEEN T. NUGENT, NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS § 9.02 (2011) ("[Non-disclosure agreements] usually provide that [confidential information] . . . will be held as confidential and will be used only in connection with an evaluation of the transaction in question.").

[106] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[107] *Id.*

[108] D.I. 23, Ex. B.

16

Agreement, HIG and its representatives agreed to "keep confidential the Evaluation

Material in accordance with the requirements of [the] letter agreement."[109]  According to

the Confidentiality Agreement, Evaluation Material does not include "information that [ ]

is or becomes generally available to the public other than as a result of a disclosure by

[defendants] or [defendants'] Representatives in violation of [the] letter agreement."[110]

Defendants argue the language from the Confidentiality Agreement prohibits the

disclosure of confidential information, not its use.[111]  However, nowhere in the

Confidentiality Agreement does it differentiate between use and disclosure.[112]  Nor do

defendants point to any specific language that makes this differentiation.[113]  As noted in

*Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, confidentiality agreements are

intended and structured to prohibit both the use and disclosure of confidential, nonpublic

information, *unless the parties agree otherwise.*[114]  Since the plain language of the

Confidentiality Agreement is not specifically limited to use or disclosure of confidential

information, the Confidentiality Agreement between plaintiffs and HIG prohibits *both* the

use and disclosure of confidential information.

Pursuant to the Confidentiality Agreement's prohibition against using and

disclosing confidential information, the amended complaint demonstrates defendants

breached, and continue to breach, this Agreement by disclosing and using "confidential

information Osco provided to defendants in contemplation of their potential purchase of

---

[109] *Id.* ¶ 2.
[110] *Id.* ¶ 1.
[111] D.I. 22 at 14.
[112] *See* D.I. 23, Ex. B.
[113] *See* D.I. 22 at 13-14; D.I. 31 at 4-6.
[114] *Martin Marietta Materials, Inc.*, 68 A.3d at 1219.

Osco."[115]  Therefore, plaintiffs' amended complaint properly states a claim for breach of

contract in relation to defendants' use and disclosure of confidential, nonpublic

information.

> b.    "Confidential, nonpublic" information

Whether the information used and disclosed by defendants was "confidential,

nonpublic information" is also at issue.  The contents of the Confidentiality Agreement

are incorporated into the Letter of Intent under Paragraph 7.[116]  Since the Letter of Intent

does not define "confidential information," it is necessary to review the Confidentiality

Agreement.  According to the Confidentiality Agreement, Evaluation Material does not

include "information that [ ] is or becomes generally available to the public other than as

a result of a disclosure by [defendants] or [defendants'] Representatives in violation of

this letter agreement."[117]  Additionally, the Confidentiality Agreement permits the use of

confidential information solely "[i]n connection with a possible collaboration involving

[HIG] and EDI/Osco."[118]  Disclosure of such information was not authorized to QM and

use of the information was limited to cooperative efforts between plaintiffs and

defendants.

Defendants argue the information they disclosed to QM, contained in the

Manufacturing Agreement, could not be confidential because QM already had

knowledge of the information because it is a party to this Agreement.[119]  While QM may

---

[115] D.I. 19 ¶¶ 77-78.
[116] D.I. 23, Ex. C ¶ 7.
[117] *Id.*, Ex. B ¶ 1.
[118] *Id.*, Ex. B.
[119] D.I. 22 at 14.

have been aware of some of the information prior to defendants' disclosure to QM, the Confidentiality Agreement does not expressly limit the definition of confidential information as defendants claim.[120]  Instead, that Agreement expressly states confidential information, i.e., Evaluation Material, means any  "information that [ ] is or becomes *generally available to the public* other than as a result of a disclosure by" defendants or their representatives.[121]  Nothing suggests the Manufacturing Agreement is generally available to the public.[122]  Therefore, the Manufacturing Agreement falls under the ambit of the broadly defined "Evaluation Material" in the Confidentiality Agreement.

### c.    Damages

Lastly, defendants argue assuming they breached the Confidentiality Agreement by using and disclosing confidential information with QM, the breach was not material and did not cause any damages.[123]  In *VLIW Technology, LLC v. Hewlett-Packard Co.*, the Delaware Supreme Court denied a motion to dismiss the plaintiffs' breach of contract claim when the complaint generally alleged "[plaintiff] has been damaged by [defendant's] breach of the 1990 Agreement."[124]

Here, defendants' argument is unsubstantiated and conclusory.  Similar to the complaint in *VLIW*, plaintiffs generally allege suffering ,"significant monetary damages, plus the loss of additional sales not yet known which discovery will reveal," resulting

---

[120] *See* D.I. 23, Ex. B.  For example, Osco's entire revenue and all sources of revenue may not be known to QM.

[121] *Id.* ¶ 1 (emphasis added).

[122] *See* D.I. 22 at 14.

[123] *Id.*

[124] *VLIW Tech., LLC*, 840 A.2d at 613.

from defendants' conduct.[125]  For purposes of a motion to dismiss, plaintiffs have

sufficiently plead damages caused by defendants' breach of the Confidentiality

Agreement.  Therefore, defendants' motion to dismiss Count Three for breach of

contract should be denied because plaintiffs' have sufficiently plead:  (1) the existence

of a contract between the parties; (2) defendants' breached the contract; and (3) as a

result of the breach, they sustained damages.

> 3.  *Count Four–Breach of Duty to Negotiate in Good Faith*

In Count Four of the amended complaint, plaintiffs allege defendants breached

the duty to negotiate in good faith.[126]  The issue is whether the Letter of Intent between

the parties created a duty to negotiate in good faith.  As a preliminary matter, there is

considerable confusion between the parties regarding the contractual duty of good faith

and the implied covenant of good faith and fair dealing; the court will address the

difference between these two legal principles.

> a.  Contractual duty of good faith:  created through the parties'
>     agreement

Under Delaware law, "the intention of the parties controls the creation of a good-

faith duty to negotiate under a letter of intent."[127]  Such a duty may arise out of *express*

language.[128]  "Moreover, '[t]he cardinal rule of contract construction is that, where

---

[125] D.I. 19 ¶ 79.

[126] *Id.* ¶¶ 80-89.

[127] *Gillenardo v. Connor Broad. Del. Co.*, No. 98C-06-015, 2002 WL 991110, at
*7 (Del. Super. Ct. Apr. 30, 2002).

[128] *Id.  See also SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 343 (Del.
2013).  While there was some ambiguity as to whether an obligation to negotiate in
good faith was enforceable before *Titan Investment Fund II, LP v. Freedom Mortgage
Corp.*, 58 A.3d 984 (Del. 2012), the *SIGA* court reaffirmed that an express contractual
obligation to negotiate in good faith is binding on the contracting parties.  *SIGA Techs.,*

possible, a court should give effect to *all* [express] provisions.'"[129]  "Thus, 'a contract

should be interpreted in such a way as to not render any of its provisions illusory or

meaningless.'"[130] Determining whether a party has indeed acted in "good faith" is a

"question of fact which generally cannot be resolved on the pleadings or without first

granting an adequate opportunity for discovery."[131]

The duty to negotiate in good faith may arise from the express provisions of a

letter of intent entered into by the parties.[132]  In *Gillenardo v. Connor Broadcasting*

*Delaware Co.*, the court held the parties' letter of intent created a good faith obligation to

negotiate to purchase defendants' radio station, where an offer was accepted by the

seller and the letter of intent expressly included:  "(1) the duty to attempt in good faith to

finalize the Sale Agreement; (2) the duty to work diligently to complete the Sale

Agreement; and (3) the duty not to solicit, accept or entertain any other offers for the

Stations while the letter of intent was in effect."[133]  Additionally, the court pointed out a

difference exists between the failure *to sell assets*, i.e., the completion of the

transaction, and a breach of the duty *to negotiate* in good faith, even if the transaction

has not been completed,[134] by noting "[r]egardless of whether [the defendant] had

reserved to itself the right not to consummate the [Sale Agreement] if the parties failed

---

*Inc.*, 67 A.3d at 343.

[129] *Gillanardo*, 2002 WL 991110, at *7 (quoting *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1184 (Del. 1992) (emphasis in original)).

[130] *Id.*

[131] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, LP*, 624 A.2d 1199, 1208 (Del. 1993).

[132] *See Gillanardo*, 2002 WL 991110, at *6.

[133] *Id.* (internal citations omitted).

[134] *Id.* at *7.

to reach accord on documentation . . . it had clearly not reserved the right to thwart final agreement by [cutting off negotiations or considering other buyers]."[135]

Similarly, even when the parties' letter of intent includes a "non-binding provision" indicating neither party is bound to complete the contract, a party nevertheless can breach the duty to negotiate in good faith.[136]  In *SIGA Technologies, Inc. v. PharmAthene, Inc.*, the Delaware Supreme Court found, although the license agreement was not binding, the defendants breached their obligation to negotiate in good faith when they disregarded the letter of intent's term sheet, and attempted to negotiate an agreement that contained drastically different economic and other terms.[137] The provision which gave rise to an express duty to negotiate in good faith stated: "SIGA and PharmAthene will negotiate in good faith with the intention of executing a definitive License Agreement in accordance with the terms set forth in the License Agreement Term Sheet attached as Exhibit C."[138]

Not every letter of intent, however, gives rise to a duty to negotiate in good faith.[139]  In *VS & A Communications Partners, L.P. v. Palmer Broadcasting Limited Partnership*, the Delaware Court of Chancery applied New York law to determine duties to negotiate in good faith are unenforceable if material terms of the contract remain open.[140]  However, as elucidated in *SIGA* and *Gillanardo*, New York law differs from

---

[135] *Id.* at *9 (quoting *RGC Int'l Investors, LDC v. Greka Energy Corp.*, No. 17674, 2001 WL 984689, at *11 (Del. Ch. Aug. 22, 2001) (citations omitted)).

[136] *See SIGA Techs., Inc.*, 67 A.3d at 343.

[137] *Id.*

[138] *Id.* at 337-38.

[139] *See VS & A Commc'ns Partners, L.P. v. Palmer Broad. Ltd. P'ship*, No. 12521, 1992 WL 339377, at *7 (Del. Ch. Nov. 16, 1992).

[140] *Id.*

Delaware law, in that, under Delaware law, the parties' intentions control whether the letter of intent creates an obligation to negotiation in good faith, despite whether material terms of the contract remain open.[141]

> b.  Implied covenant of good faith and fair dealing:  created by statute, implied in parties' agreements

The implied covenant of good faith and fair dealing "requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain."[142]  To bring a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege the breaching party's actions were motivated by an improper purpose reflecting bad faith.[143]  However, an implied obligation may not prohibit acts that the terms of the parties' agreement expressly permit, even when the allowable conduct expressly favors one party's interests.[144]  The implied covenant of good faith and fair dealing applies, if at the time of contract formation, the parties would have prohibited the conduct had they contemplated it or thought to negotiate about it.[145]  "To state a claim for breach of an implied covenant of good faith and fair dealing, the Plaintiffs must identify a specific implied contractual obligation."[146]

---

[141] *See SIGA Techs., Inc.*, 67 A.3d at 344-45; *Gillanardo*, 2002 WL 991110, at *7.

[142] *Dunlap v. State Farm Fire & Casualty Co.*, 878 A.2d 434, 442 (Del. 2005) (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch 1985)).

[143] *Dunlap*, 878 A.2d at 442.

[144] *Cinncinnati SMSA Ltd. P'Ship v. Cincinnati Bell Cellular*, 708 A.2d 989, 992 (Del. 1998).

[145] *See Katz v. Oak Indus., Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986); *Cincinnati SMSA Ltd. P'ship*, 708 A.2d at 992; *Dunlap*, 878 A.2d at 442.

[146] *Kelly v. McKesson HBOC, Inc.*, No. 99C-09-265, 2002 WL 88939, at *10 (Del. Super. Ct. Jan. 17, 2002).

          c.      Plaintiffs' allegation of breach of contractual duty of good faith

Plaintiffs claim in their amended complaint defendants breached the "duty to negotiate in good faith" created through the Letter of Intent and the Confidentiality Agreement.[147]  Thus, plaintiffs have not specifically alleged a claim for an *implied* covenant to negotiate in good faith; rather, they contend the Letter of Intent created an *express* covenant to negotiate in good faith.[148]  Plaintiffs' introduction of a claim for a breach of the implied duty of good faith and fair dealing in their brief is not evident anywhere in the amended complaint, and therefore, has not been properly asserted or pled.[149]  Therefore, court agrees with defendants' argument that this claim should be dismissed or not considered.

Defendants argue Count Four should be dismissed because the Letter of Intent did not contain a provision to negotiate in good faith; and alternatively, even if the Letter of Intent included that obligation, plaintiffs' damages are improperly based on the lost sale because of defendants' failure to purchase Osco.[150]

          i.      Contractual duty to negotiate in good faith

The initial issue is whether the Letter of Intent created a duty to negotiate in good faith.  Paragraph 8 of the Letter of Intent states:

> Other than Sections 6 and 7 hereof, which shall be binding and effective upon the parties hereto . . . the parties acknowledge that they neither intend to enter, nor have they entered, into any agreement to negotiate a definitive written agreement pursuant to this letter.  Either party may, at

---

[147] D.I. 19 ¶¶ 80-89.
[148] *See id.*
[149] *See Kelly*, 2002 WL 88939, at *10.
[150] D.I. 22 at 15-17.

any time prior to the execution of such a definitive written agreement, propose different terms from those summarized herein or unilaterally terminate all negotiations pursuant to this letter without any liability whatsoever to the other party.[151]

Paragraph 6 of the Letter of Intent provides: "[d]uring the Exclusivity Period, Buyer and the Company will exert *every reasonable effort* to negotiate and execute a Definitive Agreement . . . ."[152]  As pointed out in *Gillanardo*, the distinction between entering into a letter of intent that creates no binding obligation *to make a purchase* and the creation of a duty *to negotiate* in good faith is important.[153]

Defendants argue Paragraph 8 of the Letter of Intent provides no duty to negotiate in good faith because of its non-binding nature.[154]  However, in light of the qualifying language at the beginning of Paragraph 8–"[o]ther than Sections 6 and 7 hereof, which shall be binding and effective upon the parties hereto"–Paragraphs 6 and 8 clearly require that, while the parties are not under any obligation to complete the sale, they are explicitly bound to use all reasonable effort in their negotiations and execution of an agreement,[155] language which is similar to the language in *Gillenardo*.[156]

ii.    Damages

---

[151] D.I. 23, Ex. C ¶ 8.

[152] *Id.* ¶ 6 (emphasis added).

[153] *Gillanardo*, 2002 WL 991110, at *7.

[154] D.I. 22 at 15-16.

[155] D.I. 23, Ex. C ¶ 6.

[156] Like the agreement in *Gillenardo*, the Letter of Intent similarly provides cooperation to complete the transaction, restrictions on soliciting discussing or negotiating offers by plaintiffs with third parties and the representation to diligently complete the review process.  D.I. 23, Ex. C at ¶¶ 3, 4, and 6.  As noted, the parties were obligated to exercise "reasonable effort" in their negotiations.  According to WEBSTER'S COLLEGE DICTIONARY 2d Edition (1997), reasonable means agreeable to or in accord with reason; logical; capable of rational behavior.  *See also*, WEBSTER'S NEW DICTIONARY OF SYNONYMS wherein synonyms include fair, equitable or just.

Alternatively, defendants argue even if there is a contractual duty to negotiate in good faith, damages consisting of Osco's lost sales of its products to Seastar is not a valid form of relief under Delaware law.[157]   The Delaware Supreme Court has recognized two types of damages for a breach of the contractual duty to negotiate in good faith:  reliance damages, measured by plaintiffs' actually incurred costs and expenses, where the parties would not have reached agreement absent defendants' bad faith; and expectation damages, where the parties would have reached an agreement but for defendants' bad faith.[158]

Plaintiffs' pleading of damages is broader than defendants' characterization.  In the amended complaint, plaintiffs assert:  "[a]s a result of said actions, Osco has suffered significant monetary damages based on H.I.G.'s and Seastar's failure to purchase Osco, plus additional damages not yet known which discovery will reveal."[159] This allegation does not limit their claim to expectation damages; but asserts possible reliance damages.

As a result of the analysis herein, and since the court must draw all reasonable factual inferences in the light most favorable to plaintiffs under Rule 12(b)(6), defendants' motion to dismiss Count Four should be denied.

## V.   ORDER AND RECOMMENDED DISPOSITION

Consistent with the findings contained herein,

IT IS RECOMMENDED that:

---

[157] D.I. 22 at 16.
[158] *SIGA Techs., Inc.*, 67 A.3d at 348, 350-51.
[159] D.I. 19 ¶ 89.

(1) Defendants' motion to dismiss for failure to state a claim (D.I. 21) be granted in part and denied in part.

(2) Defendants' motion to stay proceedings be denied (D.I. 21).

Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), FED. R. CIV. P. 72 (b)(1), and D. DEL. LR 72.1, any objections to the Report and Recommendation shall be filed within fourteen (14) days limited to ten (10) pages after being served with the same.  Any response shall be limited to ten (10) pages.[160]

The parties are directed to the Court's Standing Order in Non-Pro Se Matters for Objections Filed under FED. R. CIV. P. 72 dated October 9, 2013, a copy of which is found on the Court's website (www.ded.uscourts.gov.)

Date: December 2, 2013          /s/  Mary Pat Thynge
                                UNITED STATES MAGISTRATE JUDGE

---

[160] FED. R. CIV. P. 72(b)(2).