**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| OSCO MOTORS COMPANY, LLC<br>d/b/a OSCO MOTORS CORPORATION<br>and ENGINE DISTRIBUTORS, INC.<br><br>             Plaintiffs,<br><br>     v.<br><br>MARINE ACQUISITION CORP.<br>d/b/a SEASTAR SOLUTIONS<br>f/k/a TELEFLEX MARINE and<br>HIG MIDDLE MARKET, LLC.<br><br>            Defendants. | C.A. No.: 13-868-RGA/MPT |

**REPORT AND RECOMMENDATION**

**I.      Introduction**

Plaintiffs, Osco Motors Company, LLC dba Osco Motors Corporation ("Osco")

and Engine Distributors, Inc. ("EDI") moved on February 28, 2014 for leave to file their

third amended complaint pursuant to Rule 15 of the  Federal Rules of Civil Procedure

("FED. R. CIV. P.").[1]  Defendants, Marine Acquisition Corp. d/b/a Seastar Solutions f/k/a

Teleflex Marine ("Seastar") and H.I.G. Middle Market, LLC ("HIG") (collectively

"defendants") oppose this motion.[2]  This court has jurisdiction pursuant to 28 U.S.C.

§ 1332.  In particular, plaintiffs seek to include additional claims against the original

defendants, as well as adding Gong Luen Metal Industrial Co., Ltd, ("Gong Luen"),

Quality Mark Taiwan, Co., Ltd. ("QM Taiwan"), and Mark Ebbenga ("Ebbenga") as

---

[1] D.I. 42.
[2] D.I. 45.

defendants.[3]  Plaintiffs' third amended complaint alleges eleven causes of action: (1) tortious interference with contractual relations against Seastar; (2) breach of contract against defendants; (3) breach of the contractual duty of good faith against defendants; (4) breach of the implied covenant of good faith and fair dealing against defendants; (5) violation of 6 DEL. C. § 2001 against defendants; (6) federal trademark infringement under 15 U.S.C. § 1114 against defendants, Gong Luen, QM Taiwan, and Ebbenga; (7) federal trademark infringement under 15 U.S.C. § 1125(a) against defendants, Gong Luen, QM Taiwan, and Ebbenga; (8) violation of 6 DEL. C. § 2001 against Gong Luen, QM Taiwan, and Ebbenga; (9) unjust enrichment against Gong Luen, QM Taiwan, and Ebbenga; (10) conversion against Gong Luen, QM Taiwan, and Ebbenga; and (11) civil conspiracy against defendants, Gong Luen, QM Taiwan, and Ebbenga.[4]

On March 28, 2014, defendants filed a brief in opposition to plaintiffs' motion, claiming that counts one, eight, nine, and ten are barred by collateral estoppel and/or res judicata, and should therefore be dismissed under FED. R. CIV. P. 12(b)(6).[5] Defendants also contend counts six, seven, and eleven fail to state a claim upon which relief can be granted and should be dismissed under FED. R. CIV. P. 12(b)(6).[6] Defendants further claim the third amended complaint should be dismissed under FED. R. CIV. P. 12(b)(2) because this court does not have personal jurisdiction over QM Taiwan.[7]

---

[3] D.I. 42.
[4] *Id.*
[5] D.I. 45.
[6] *Id.*
[7] *Id.*

2

On April 11, 2014, plaintiffs responded to defendants' arguments and also asserted the court should stay the proceedings until the District Court for the District of Minnesota renders its decision on plaintiffs' motion to vacate the arbitration judgment made between plaintiffs and Quality Mark, Inc. ("QM").[8]  The hearing for plaintiffs' motion to vacate the arbitrator's award is scheduled for June 27, 2014.[9]

## II.    Background[10]

### A.    Parties

Osco is a producer and distributor of marine engines, manifolds, risers, and accessory parts.[11]  Osco is a wholly-owned subsidiary of EDI, which sells multiple brands of marine engine components into the marine market.[12]  Seastar is a manufacturer and distributor of marine control systems, engine and drive components and other product for the original equipment manufacturing and after marine market.[13] The products sold by Seastar include manifolds produced by Osco.[14]  HIG is a private equity and venture capital investment firm, as well as Seastar's partner and equity sponsor.[15]  Gong Luen is a foundry that manufactures and produces metal castings used to mold various products, including marine engines, manifolds, and risers.[16]  QM Taiwan is a broker that arranges the sale and shipment of goods manufactured by Gong

---

[8] D.I. 47.
[9] *Id.* Ex. D.
[10] D.I. 42.
[11] *Id.* at ¶ 10.
[12] *Id.* at ¶¶ 11, 13.
[13] *Id.* at ¶ 17.
[14] *Id.*
[15] *Id.* at ¶ 19.
[16] *Id.* at ¶ 20.

Luen.[17]  Mark Ebbenga is the President of Quality Mark ("QM"), a partner of Gong Luen and QM Taiwan, and he is the owner and principal or alter-ego of QM Taiwan.[18]

### B.    Factual Background

On January 1, 2011, Osco and EDI entered into a Manufacturing Agreement[19] with QM, where QM would produce manifolds for plaintiffs on an exclusive basis.[20] According to the Manufacturing Agreement, QM was not permitted to manufacture or sell Osco products to any entity other than plaintiffs.[21]  The parties at all times intended for the Manufacturing Agreement to be a valid agreement between Osco and/or EDI and QM and according to its terms, QM and Ebbenga utilized Gong Luen and QM Taiwan to manufacture and ship Osco products to plaintiffs.[22]  Additionally, the Manufacturing Agreement specified that if Osco was sold during the life of the agreement, the Manufacturing Agreement would automatically renew under the same terms and conditions with the company that purchased Osco.[23]  The Manufacturing Agreement further required all disputes relating to its terms be resolved by mediation or arbitration in Minneapolis, Minnesota.[24]

In early 2011, defendants began an investigation regarding the possible purchase of Osco and entered into a Confidentiality Agreement[25] with plaintiffs on

---

[17] *Id.* at ¶ 21.
[18] *Id.* at ¶ 22.
[19] D.I. 47, Ex. A.
[20] D.I. 42 at ¶ 23.
[21] *Id.* at ¶ 24.
[22] *Id.* at ¶¶ 27-28.
[23] *Id.* at ¶ 34.
[24] *Id.* at ¶ 35.
[25] D.I. 23, Ex. B.

July 25, 2011.[26]  The Confidentiality Agreement is a form letter utilized by defendants in contemplation of purchasing companies and it referenced a "possible collaboration" between HIG and plaintiffs.[27]  During the same time period, defendants and QM entered into a Confidentiality Agreement using a form letter similar to the Confidentiality Agreement between defendants and plaintiffs.[28]  The Confidentiality Agreement between QM and the defendants also contained a clause that all disputes between them would be resolved in Delaware.[29]

On or about September 11, 2012, plaintiffs and defendants executed a Letter of Intent,[30] whereby plaintiffs agreed not to solicit or negotiate any other potential agreements regarding the sale of Osco with any other companies, while defendants agreed to conduct timely due diligence.[31]  The Letter of Intent provided the content of the negotiations regarding defendants' potential acquisition would not be disclosed to any third parties, and the terms of the Confidentiality Agreement were  incorporated within it.[32]

Following the execution of the Letter of Intent between plaintiffs and defendants, Seastar had direct communications with QM and QM Taiwan about the shipment of Osco products and the fabrication of tooling to be used to manufacture products following Seastar's potential acquisition of the Osco assets.[33]  In November and

---

[26] D.I. 42 at ¶ 45.
[27] *Id.* at ¶ 46, 49; D.I. 23, Ex. B.
[28] D.I. 42 at ¶ 50.
[29] *Id.*
[30] D.I. 23, Ex. C.
[31] D.I. 42 at ¶ 51.
[32] *Id.* at ¶ 52.
[33] *Id.* at ¶ 53.

December 2012, QM's President, Mark Ebbenga, had multiple meetings with Seastar's Vice President of Sales to discuss the possible purchase of Osco.[34]  During these meetings, Ebbenga and Seastar's Vice President of Sales agreed QM would sell Osco products directly to Seastar without plaintiffs' involvement.[35]  Seastar and QM exchanged documents, including the Confidentiality Agreement signed between Seastar and plaintiffs.[36]  Osco President, Glenn Cummins, Jr., ("Cummins") became aware of the communications and informed Seastar and QM that all communications regarding Osco products must be directed to plaintiffs.[37]  Cummins also informed Seastar that all orders for Osco products needed to go through Osco and could not be transmitted directly to QM.[38]  Additionally, Cummins mentioned to Seastar that the Manufacturing Agreement between plaintiffs and QM could not be negotiated or otherwise altered by Seastar and QM before plaintiffs finalized the sale of the Osco assets to Seastar.[39]

During the course of Seastar's investigation regarding the potential purchase of Osco, it became aware of the Manufacturing Agreement between plaintiffs and QM.[40]  Seastar learned that, as a result of the Manufacturing Agreement, QM had complete control over the Osco product being shipped to plaintiffs' customers and the tooling used to manufacture the product.[41]  Therefore, Seastar was aware QM was capable of shipping Osco products or products manufactured with the tooling solely owned by

---

[34] *Id.* at ¶ 55.
[35] *Id.* at ¶ 56.
[36] *Id.* at ¶ 57.
[37] *Id.* at ¶ 58.
[38] *Id.* at ¶ 59.
[39] *Id.* at ¶ 60.
[40] *Id.* at ¶¶ 61-62.
[41] *Id.* at ¶ 63.

plaintiffs, directly to any customer of its choosing.[42]  In further review of due diligence documents, Seastar learned QM and plaintiffs jointly owned the tooling necessary for the manufacture of all Osco products, and according to the terms of the Manufacturing Agreement, Osco could own the tooling unconditionally by January 2016.[43]  Seastar also learned Gong Luen was responsible for manufacturing all Osco products.[44]

Although plaintiffs authorized certain conversations between QM and Seastar during the due diligence period, they never authorized QM and Seastar to negotiate a new manufacturing agreement that would commence after the sale of the Osco assets or to allow Gong Luen to manufacture product or fabricate tooling upon Seastar's request.[45]  Plaintiffs again informed Seastar that the Manufacturing Agreement between Osco and QM was not negotiable and would transfer to Seastar in its current form following Seastar's acquisition of the Osco assets.[46]  Regardless of these apparent understandings, and without plaintiffs' approval, Seastar continued to negotiate with QM to create a new manufacturing agreement between them effective following the sale of the Osco assets.[47]  In contravention of the Letter of Intent and the Confidentiality Agreement, Seastar disclosed plaintiffs' confidential information regarding customers and price terms to QM.[48]  Also, as negotiations between plaintiffs and Seastar continued, Seastar made direct orders to QM for specific tooling to be fabricated to

---

[42] *Id.*
[43] *Id.* at ¶ 64.
[44] *Id.* at ¶ 65.
[45] *Id.* at ¶ 67.
[46] *Id.* at ¶ 68.
[47] *Id.* at ¶ 69.
[48] *Id.* at ¶ 71.

manufacture parts.[49]  The requested tooling was fabricated by Gong Luen.[50]  Following this request, QM contacted plaintiffs and requested approval to sell Osco products and manifolds directly to Seastar.[51]  Plaintiffs denied QM's request pursuant to the terms of the Manufacturing Agreement.[52]

On January 15, 2013, the President of QM Taiwan, Ms. Lee ("Lee"), gave plaintiffs notice of an alleged breach of the Manufacturing Agreement between QM and plaintiffs, due to nonpayment of invoices.[53]  Plaintiffs contested the unpaid invoices and Lee advised unless the breach was remedied, the Manufacturing Agreement would expire in 60 days or on March 15, 2013.[54]  On January 28, 2013, plaintiffs met with Ebbenga, and Seastar's Vice President of Sales to discuss a proposed extension of terms of the Letter of Intent, particularly the extension of the provision that prohibited plaintiffs from soliciting offers or negotiating the sale of Osco with any other entity for a period of 90 days.[55]  Cummins believed Seastar had sufficient time to conduct its due diligence, so he crossed out the 90 day extension and inserted that the agreement would terminate on February 27, 2013.[56]

After the extension was signed, Lee informed plaintiffs that the outstanding invoices had to be addressed by February 28, 2013 or the Manufacturing Agreement

---

[49] *Id.* at ¶ 72.
[50] *Id.* at ¶ 73.
[51] *Id.* at ¶ 74.
[52] *Id.* at ¶ 75.
[53] *Id.* at ¶ 76.
[54] *Id.* at ¶¶ 76-77.
[55] *Id.* at ¶ 78.
[56] *Id.* at ¶ 80.

between plaintiffs and QM would terminate.[57]  Cummins responded advising plaintiffs would work with QM and QM Taiwan to resolve the problem; however, QM did not cooperate in addressing the validity of a number of unpaid invoices prepared by QM Taiwan.[58]  Seastar continued to conduct its due diligence and appeared ready to purchase the Osco assets; however, Seastar and QM still directly communicated about the sale of the Osco assets and the manufacturing of the Osco product.[59]  Seastar and QM continued to negotiate the terms of a new manufacturing agreement, despite being informed by plaintiffs that the present Manufacturing Agreement was non-negotiable.[60] It appeared that QM and Seastar were unable to agree upon the terms of a new manufacturing agreement, and Seastar informed Osco that the purchase of the Osco assets could not be completed due to QM's refusal to abide by the terms of the Manufacturing Agreement entered into between QM and plaintiffs.[61]

On February 28, 2013, the day after the extension to the Letter of Intent expired, Seastar representatives met with Ebbenga to discuss the sale and purchase of manifolds manufactured on tooling that Seastar believed to be owned jointly by QM and plaintiffs.[62]  Following this meeting, Seastar purchased Osco product directly from QM, despite plaintiffs warnings.[63]  Seastar did not inform plaintiffs of these purchases.[64] Defendants negotiated an agreement with QM, whereby QM would become defendants'

---

[57] *Id.* at ¶ 81.
[58] *Id.* at ¶ 82.
[59] *Id.* at ¶ 83.
[60] *Id.* at ¶ 84.
[61] *Id.* at ¶ 85-86.
[62] *Id.* at ¶ 87.
[63] *Id.* at ¶ 89.
[64] *Id.*

exclusive supplier of marine equipment.[65]  Plaintiffs maintain these negotiations were substantively aided by the information obtained by Seastar during its due diligence process.[66]  On October 14, 2013, Seastar acquired Mallory Marine, which was one of plaintiffs' largest customers of Osco product.[67]  Following this acquisition, Seastar now controls a substantial portion of the marine manifold market.[68]

In March 2013, plaintiffs' representatives, in an attempt to inspect the Osco product and tooling, were denied access to Gong Luen's Foundry in Taiwan where the product had been manufactured pursuant to the Manufacturing Agreement with QM.[69] All subsequent attempts by plaintiffs to address the status of their tooling have been denied.[70]  QM Taiwan and Ebbenga now sell Osco product manufactured by Gong Luen, with the Osco trademark removed despite plaintiffs' ownership of the tooling.[71] Although defendants were informed by QM Taiwan that Gong Luen incorrectly marked products with the Osco trademark, they continued to accept the mislabeled products and sold them in the marine manifold marketplace.[72]  Gong Luen manufactured additional product using plaintiffs' tooling, bearing the Osco trademark, which was sold in the marine manifold marketplace by defendants, QM Taiwan, and/or Ebbenga.[73] Meanwhile, Seastar continues to purchase directly from QM, product manufactured

---

[65] *Id.* at ¶ 90.
[66] *Id.*
[67] *Id.* at ¶ 91.
[68] *Id.* at ¶ 92.
[69] *Id.* at ¶ 93.
[70] *Id.* at ¶ 95.
[71] *Id.* at ¶¶ 96-98.
[72] *Id.* at ¶¶ 99-101.
[73] *Id.* at ¶ 102.

from tooling solely owned by Osco.[74]

## C.    Procedural Background

On May, 17, 2013, Osco filed its original complaint against Seastar and HIG, alleging tortious interference with contractual relations; injunctive relief; breach of contract; and breach of the duty to negotiate in good faith.[75]  On July 22, 2013, defendants moved to dismiss the claim of tortious interference with contractual relations pursuant to FED. R. CIV. P. 12(b)(1) for lack of standing, and the remaining three claims under FED. R. CIV. P. 12(b)(6) for failure to state a claim.[76]  On August 6, 2013, Osco filed an amended complaint adding Osco Motors Corporation, the name Osco does business as, and EDI, as plaintiffs.[77]  Subsequently, defendants withdrew their FED. R. CIV. P. 12(b)(1) motion as to the first count.[78]  On August 23, 2013, defendants moved to dismiss the second, third, and fourth counts of the amended complaint pursuant to FED. R. CIV. P. 12(b)(6) for failure to state a claim, and moved to stay the proceedings until the resolution of an arbitration between plaintiffs and QM, then a non-party, was concluded.[79]

A report and recommendation recommended defendants' motion to dismiss count two be granted and counts three and four be denied.[80]  It also denied defendants'

---

[74] *Id.* at ¶ 104.
[75] D.I. 1.
[76] D.I. 12.
[77] D.I. 19.
[78] D.I. 20.
[79] D.I. 21.
[80] D.I. 34.

motion to stay proceedings.[81]  Defendants objected.[82]  On January 16, 2014, the district judge granted defendants' motion to dismiss counts two and four, denied the motion as to count three, and denied defendants' motion to stay.[83]  Plaintiffs were granted leave to file an amended complaint as to count four.[84]

On January 29, 2014, plaintiffs filed a second amended complaint.[85]  Before defendants responded to the second amended complaint, plaintiffs moved for leave to file a third amended complaint on February 28, 2014.[86]  The issue of whether to grant plaintiffs' motion for leave to amend is presently under consideration.

### 1.   Arbitration Proceeding

According to the Manufacturing Agreement between Osco and QM, any dispute would be resolved by arbitration in Minnesota under state law.[87]  On May 30, 2013, plaintiffs initiated their request for arbitration, contending QM breached the Manufacturing Agreement by selling Osco products to third parties.[88]  On March 11, 2014, the arbitrator ruled in favor of QM and denied all plaintiffs' claims.[89]  The arbitrator found plaintiffs breached the Manufacturing Agreement by failing to pay invoices to QM, thereby effectively terminating the agreement on February 28, 2013.[90]  The arbitrator reasoned QM could only mitigate damages caused by plaintiffs by selling Osco products

---

[81] *Id.*
[82] D.I. 35.
[83] D.I. 38.
[84] *Id.*
[85] D.I. 39.
[86] D.I. 42.
[87] D.I. 47, Ex. A.
[88] *Id.*
[89] D.I. 46, Ex. A.
[90] *Id.*

to third parties.[91]  For plaintiffs' additional claims of misuse of confidential

information/trade secrets, wrongful retention of Osco's tooling, wrongful interference

with contract, wrongful interference with prospective business advantage and wrongful

stealing of customers, the arbitrator concluded they were not supported by evidence

and barred by plaintiffs' own breach of the contract.[92]  The arbitrator further determined

plaintiffs were liable to QM for costs of $302,052, which comprise of unpaid invoices

and mitigation expenses.[93]

On April 2, 2014, plaintiffs moved to vacate the arbitration award in United States

District Court for the District of Minnesota.[94]  QM moved to confirm the award.[95]  The

hearing on the motion to vacate will occur on June 27, 2014.[96]

## III.    Position of Parties

### A.    Counts 1, 8, 9, 10, and 11

### Count 1

In regards to count one for tortious interference with contractual relations,

plaintiffs assert Seastar, when conducting its due diligence on the potential purchase of

Osco, became aware of the details of the Manufacturing Agreement between plaintiffs

and QM and realized QM was prohibited from manufacturing or selling Osco products to

any other company besides plaintiffs.[97]  Despite this knowledge, Seastar ordered Osco

---

[91] *Id.*
[92] *Id.*
[93] *Id.*
[94] D.I. 47, Ex. K.
[95] *Id.*, Ex. C.
[96] *Id.*, Ex. D.
[97] D.I. 42 at ¶¶ 109-110

products directly from QM and stopped ordering directly from plaintiffs.[98]  Due to Seastar's purchase of Osco product directly from QM, plaintiffs contend their business relations with other existing customers, as well as with QM, was injured.[99]

Defendants contend this claim is futile because plaintiffs are barred by collateral estoppel from proving an intentional act that is a significant factor in causing the breach of contract tortious interference with contractual relations.[100] Defendants state plaintiffs are unable to argue that QM breached the Manufacturing Agreement because that issue was precisely litigated in the arbitration between plaintiffs and QM.[101]  Defendants assert since the arbitrator determined plaintiffs breached and thus terminated the Manufacturing Agreement, they are collaterally estopped from now claiming defendants committed an intentional act that was a substantial factor in causing QM's breach of the agreement.[102]  In light of the arbitration findings, defendants aver any sale of Osco products from QM to defendants after February 28, 2013 could not constitute a breach of the agreement.[103]

### Count 8

Count eight alleges violation of the Delaware Uniform Trade Secrets Act ("DUTSA"), 6 Del. C. § 2001 *et. seq.*, against Gong Luen, QM Taiwan, and Ebbenga. Plaintiffs contend that due to the Manufacturing Agreement between plaintiffs and QM, Gong Luen, QM Taiwan, and/or Ebbenga obtained plaintiffs' trade secrets relating to the

---

[98] *Id.* at ¶¶ 112-113.
[99] *Id.* at ¶ 114.
[100] D.I. 45 at 9.
[101] *Id.*
[102] *Id.* at 10.
[103] *Id.*

formula, pattern, method, technique, and process for manufacturing the Osco product.[104]   Despite plaintiffs' significant efforts to maintain the secrecy of their trade secrets, Gong Luen, QM Taiwan, and Ebbenga used such information to manufacture the Osco product and sell it in the marketplace.[105]   Plaintiffs further claim because of the actions of Gong Luen, QM Taiwan, and/or Ebbenga in disclosing and misappropriating the trade secrets, plaintiffs suffered substantial monetary damages.[106]   Defendants assert count eight is futile because it is barred by collateral estoppel and res judicata.[107]   Defendants argue the issue of whether QM misappropriated plaintiffs' trade secrets was litigated in arbitration, and the arbitrator determined "there was no evidence that QM used any information other than what it had become aware of during the execution of the contract and its own industry knowledge."[108]   Since the same issue was already litigated, defendants maintain count eight is barred.

### Count 9

Under count nine for unjust enrichment against Gong Luen, QM Taiwan, and Ebbenga, plaintiffs argue that as a result of the Manufacturing Agreement between plaintiffs and QM, Gong Luen and/or QM Taiwan acquired tooling to manufacture the Osco product.[109]   According to the terms of the agreement, plaintiffs paid 50% of the cost for all new tooling created by Gong Luen, and therefore own at least 50% of the

---

[104] D.I. 42 at ¶ 186.
[105] *Id.* at ¶¶  190, 192.
[106] *Id.* at ¶ 194.
[107] D.I. 45 at 11.
[108] *Id.*
[109] D.I. 42 at ¶ 196.

tooling in the possession of Gong Luen and/or QM Taiwan.[110]  Plaintiffs claim they cannot access the tooling and Gong Luen and/or QM Taiwan continue to use the tooling to fill orders from QM.[111]  Plaintiffs additionally contend Gong Luen and/or QM Taiwan possess the Osco product that was made pursuant to the Manufacturing Agreement, and now sell that product to third parties, including defendants.[112]  Because of such conduct, plaintiffs claim to have suffered significant monetary damages.[113]

Defendants respond that count nine is barred by collateral estoppel and res judicata because this issue was already litigated and resolved in arbitration, wherein the arbitration award explicitly rejected plaintiffs' unjust enrichment claim.[114]  Defendants further note that whether QM and/or Gong Luen, QM Taiwan, and Ebbenga were enriched or plaintiffs impoverished was addressed since the arbitrator reduced QM's award by the amount Osco paid for the tooling and denied QM's request for payment on outstanding tooling invoices and certain monetary relief based on double counting.[115]

### Count 10

With respect to count ten for conversion against Gong Luen, QM Taiwan, and Ebbenga, plaintiffs assert Gong Luen and QM Taiwan intentionally and illegally converted plaintiffs' ownership interest in the tooling for their own personal use and benefit to fulfill orders from QM.[116]  Plaintiffs also contend since Gong Luen and/or QM

---

[110] *Id.* at ¶¶ 197-198.
[111] *Id.* at ¶¶ 199-200.
[112] *Id.* at ¶¶ 201-202.
[113] *Id.* at ¶ 205.
[114] D.I. 45 at 12.
[115] *Id.*
[116] D.I. 42 at ¶¶ 208, 210.

16

Taiwan possess the Osco product and are selling it, they have no lawful justification for denying plaintiffs rights and benefits as joint owners of the tooling and product.[117]  In light of Gong Luen's and QM Taiwan's conduct, including their refusal to compensate plaintiffs, plaintiffs claim monetary damages.[118]

Defendants argue count ten is futile because it is also barred by collateral estoppel and res judicata.[119]  Defendants state plaintiffs' conversion claim was previously adjudicated and denied in arbitration, where the claim was found as "not supported by the evidence or the law and barred by [plaintiffs'] own breach of contract."[120]  The arbitrator found QM's selling of the plaintiffs' inventory was an appropriate mitigation action in response to their breach.[121]  Because this claim was already litigated and subsequently resolved, defendants maintain it should be dismissed.

### Count 11

For count eleven, plaintiffs allege defendants, Gong Luen, QM Taiwan, and Ebbenga committed civil conspiracy in agreeing to deprive plaintiffs' ownership in the tooling and Osco products manufactured pursuant to the Manufacturing Agreement.[122] In furtherance of this conspiracy, plaintiffs argue Gong Luen, QM Taiwan, and/or Ebbenga removed Osco identifying marks on these products and sold them.[123]  Plaintiffs

---

[117] *Id.* at ¶¶ 211, 212, 214.
[118] *Id.* at ¶¶ 215-216.
[119] D.I. 45 at 13.
[120] *Id.*
[121] *Id.*
[122] D.I. 42 at ¶ 218.
[123] *Id.* at ¶ 220.

further maintain defendants, Gong Luen, QM Taiwan, and Ebbenga willfully conspired to misappropriate and use plaintiffs' trade secrets in violation of DUTSA.[124]  Because of the actions of these parties, the distribution and sale of goods bearing the Osco trademark has caused confusion, mistake, and deception regarding the ownership and authenticity of the goods made by Gong Luen from tooling solely owned by plaintiffs, resulting in violation of Section 43(a)(1)(A) and Section 32(1) of the Lanham Act.[125]

Defendants note plaintiffs' argument, that they were deprived of their ownership of the tooling and the Osco product manufactured from the tooling, was already resolved in the arbitration proceeding and therefore, cannot serve as the underlying basis for conspiracy because it is barred by collateral estoppel and res judicata.[126]  They reason plaintiffs' claim for conspiracy to misappropriate trade secrets is preempted by DUTSA, 6 DEL. C. § 2007, which bars conspiracy for misappropriation of trade secrets, relying on *Savor, Inc. v. FMR Corp.,*[127] and *Total Care Physicians, P.A. v. O'Hara, M.D.*[128]  In those matters, the courts dismissed the conspiracy claims because they relied on the same facts used to support the misappropriation of trade secrets claims.[129]

### B.    Counts 6 and 7

In count six, plaintiffs allege defendants, Gong Luen, QM Taiwan, and Ebbenga committed federal trademark infringement under 15 U.S.C. § 1114(1), because

---

[124] *Id.* at ¶ 221.
[125] *Id.* at ¶ 222.
[126] D.I. 45 at 14.
[127] 812 A.2d 894, 898 (Del. 2002).
[128] 798 A.2d 1043, 1057 (Del. Sup. Ct. 2001).
[129] D.I. 45 at 15.

defendants, QM Taiwan, and/or Ebbenga's distribution and sale of goods bearing the Osco trademark cause confusion, mistake, and deception regarding ownership and authenticity of the goods manufactured by Gong Luen from tooling solely owned by plaintiffs.[130]  The unauthorized use of plaintiffs' federally registered mark will lead the public to believe defendants, Gong Luen, QM Taiwan, and/or Ebbenga are affiliated with plaintiffs and approved to manufacture such goods, decreasing plaintiffs' revenue through the sale of their product bearing the Osco trademark.[131]  Due to willful infringement of the Lanham Act, 15 U.S.C. § 1114, plaintiffs claim significant monetary damages, and the profits of defendants, QM Taiwan, Ebbenga, and/or Gong Luen under 15 U.S.C. § 1117(a), treble damages pursuant to 15 U.S.C. § 1117(b), injunctive relief pursuant to 15 U.S.C. § 1116(a), and an order compelling the impounding of all infringing materials because of the use of counterfeit trademarks under 15 U.S.C. § 1116(d).[132]

For count seven, plaintiffs assert Gong Luen, QM Taiwan, and Ebbenga committed federal trademark infringement under 15 U.S.C. § 1125(a).[133] Similar to count six, plaintiffs allege they are entitled to the same remedies.[134]

Defendants respond that plaintiffs, in the third amended complaint, admit defendants were authorized to receive the Osco product directly from QM Taiwan and resell it into the marketplace as a wholesale customer.[135]  Defendants maintain this

---

[130] D.I. 42 at ¶¶ 170, 173.
[131] *Id.* at ¶¶ 170-171.
[132] *Id.* at ¶¶ 173-177.
[133] *Id.* at ¶ 182.
[134] *Id.* ¶ 184.
[135] D.I. 45 at 15-16.

authorization is a defense to trademark infringement and false designation of origin, and as a result, the Lanham Act claims fail to state a claim for relief.[136]

### C.    Personal Jurisdiction

Defendants contend plaintiffs' third amended complaint should be dismissed pursuant to FED. R. CIV. P. 12(b)(2) because the court does not have personal jurisdiction over Gong Luen, QM Taiwan, or Ebbenga.[137]  They assert since these parties do not regularly do or solicit business in Delaware, nor derive substantial revenue from services or goods used or consumed in this jurisdiction, the court does not have general jurisdiction.[138]  Further, because the litigation does not arise from any contacts by Gong Luen, QM Taiwan, or Ebbenga with this forum, the court does not have specific jurisdiction.[139]  Defendants note although the forum selection clause in the Confidentiality Agreement includes Delaware, this agreement was between defendants and QM:  Gong Luen, QM Taiwan, and Ebbenga were not parties to it.[140]  Defendants assert plaintiffs' arguments of personal jurisdiction based on conspiracy fails because the requisite elements of a conspiracy are absent.[141]

In their response, plaintiffs maintain if Gong Luen, QM Taiwan, and Ebbenga are conspirators in the two asserted violations of the Lanham Act, then they satisfy the first two elements for jurisdiction.[142]  Plaintiffs claim the remaining elements are satisfied

---

[136] *Id.*
[137] *Id.* at 16.
[138] *Id.* at 18.
[139] *Id.*
[140] *Id.*
[141] *Id.* at 19-20.
[142] D.I. 47 at 7-8.

because the Confidentiality Agreement between defendants and QM, was signed by Ebbenga and provided all disputes be resolved in Delaware.[143]  Plaintiffs further note since Ebbenga is the President of QM, a partner of Gong Luen, and the owner, principal or alter-ego of QM Taiwan, it is reasonable to infer these parties were aware of the Delaware jurisdiction clause in the Confidentiality Agreement.[144]  As a result, all requirements of the conspiracy theory of jurisdiction are satisfied.[145]

## IV.    Standard of Review

### A.    Standard for Leave to File Amended Complaint under Rule 15(a)

The court considers motions to amend pleadings under FED. R. CIV. P. Rule 15(a), which provides that leave shall be freely given "when justice so requires." Therefore, "if the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."[146]  While the decision of whether to grant or deny a motion to amend is within the discretion of the court, under *Foman v. Davis*,[147] the Supreme Court has found leave to amend should be freely granted "in the absence of . . . undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc."[148]

---

[143] *Id.* at 8.
[144] *Id.*
[145] *Id.*
[146] *Foman v. Davis*, 371 U.S. 178, 182 (1962).
[147] 371 U.S. 178 (1962).
[148] *Id.* at 182.

In assessing futility, the court applies the same standard of legal sufficiency as under Rule 12(b)(6).[149]  Under this analysis, all factual allegations and all reasonable inferences are accepted as true, and "the court cannot conclude beyond doubt that the plaintiffs can prove no set of facts in support of their claim which would entitle them to relief."[150]  "Only where it is clear . . . that a claim has no possibility of succeeding on the merits, will the court disallow it by denying leave to amend."[151]  An amendment is futile when it fails to state a claim upon which relief may be granted.[152]  Therefore, a proposed amendment to a complaint will be futile if it cannot withstand a motion to dismiss.[153]

### B.    Heightened Pleading Standard Under Rule 9(b)

FED. R. CIV. P. 9(b) provides allegations of fraud or mistake must be stated with particularity in describing the circumstances of fraud or mistake.  Rule 9(b) requires a plaintiff plead with particularly to place a defendant on notice of the specific misconduct being charged.[154]  A plaintiff may include allegations of "date, place or time" to fulfill the particularly requirement of Rule 9(b), but they are not required.[155]  "Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud."[156]  When substantive information lies within another party's

---

[149] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).
[150] *Athletes Foot of Delaware, Inc., v. Ralph Libonati Co., Inc.,* 445 F. Supp. 35, 50 (D. Del. 1997).
[151] *Agere Systems Guardian Corp. v. Proxim, Inc.,* 190 F. Supp. 2d 726, 736 (D. Del. 2002).
[152] *In re Merck & Co., Inc.,* 493 F.3d 393, 400 (3d Cir. 2007).
[153] *Jablonski v. Pan American World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988).
[154] *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).
[155] *Id.*
[156] *Id.*

control, a plaintiff may plead based on information and belief, "but only if the pleading sets forth the specific facts upon which the belief is reasonably based."[157]  Rule 9(b) must also be read in connection with Rule 8(a)(2), which provides "a pleading shall contain . . . a short and plain statement of the claim."[158]  In satisfying Rule(9), in conjunction with Rule 8(a)(2), "the requirement of particularity . . . does not entail an exhaustive cataloging of facts but only sufficient factual specificity to provide assurance that plaintiff has investigated . . . the alleged fraud and reasonably believes that a wrong has occurred."[159]

## V.   Discussion

### A.   Plaintiffs' Motion for Leave to File Third Amended Complaint

#### 1.   Personal Jurisdiction over Gong Luen, QM Taiwan, and Ebbenga under Count 6, 7, 8, 9, 10, and 11

In assessing the third amended complaint, it first must be determined whether the court has personal jurisdiction over Gong Luen, QM Taiwan, and Ebbenga.  To establish personal jurisdiction, plaintiffs must present facts sufficient in satisfying two requirements:  statutory and constitutional showing that jurisdiction is proper.[160]  Personal jurisdiction may exist under either general jurisdiction or specific jurisdiction. General jurisdiction is shown by a defendant's "continuous and systematic" contacts with the forum, regardless of whether their activities are related to the particular cause

---

[157] *Brinkmeier v. BIC Corp.*, 733 F. Supp. 2d 552, 559 (D. Del. 2010).
[158] *Gissen v. Colorado Interstate Corp.*, 62 F.R.D. 151, 154 (D. Del. 1974).
[159] *Temple v. Haft*, 73 F.R.D. 49, 53 (D. Del. 1976).
[160] *Mellon Bank (East) P.S.F.S. v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992).

of action or if a plaintiff's claim arises from a defendant's non-forum related activities.[161]

Specific jurisdiction arises out of a defendant's forum-related conduct, in that a

defendant "should reasonably anticipate being haled into court" in that forum.[162]  "It is

essential . . . that there be some act by which the [party] purposefully avails itself of the

privilege of conducting activities in the forum state, thus invoking the benefits and

protections of its laws."[163]  When there has been a showing of minimum contacts, the

"contacts may then be considered in light of other factors to determine whether the

assertion of personal jurisdiction would comport with 'fair play and substantial

justice.'"[164]  While the "court must accept as true all allegations of jurisdictional fact

made by the plaintiff and resolve all factual disputes in the plaintiff's favor,"[165] the

plaintiff must sufficiently allege facts which "establish with reasonable particularity that

jurisdiction over the defendants exists."[166]  Under FED. R. CIV. P. Rule 4(e), a district

court may exercise personal jurisdiction "over non-resident defendants to the extent

permissible under the law of the state where the district court sits."[167]  In its analysis, the

court must determine if there is a statutory basis for exercising jurisdiction under the

---

[161] *See Vetrovex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 151 n.3 (3d Cir. 1996) (citations omitted).

[162] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

[163] *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

[164] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)).

[165] *Christ v. McCormick*, No. C.A. 06-275-GMS, 2007 WL 2022053, at *3 (D. Del. July 10, 2007) (quoting *Shamrock Holdings of California, Inc. v. Arenson*, 421 F. Supp. 2d 800, 803 (D. Del. 2006)).

[166] *Id.* (quoting *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.*, 147 F. Supp. 2d 268, 271 (D. Del. 2001)).

[167] *Pennzoil Prod. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 200 (3d Cir. 1998).

state's long arm statute.[168]

In relevant part, the Delaware Long Arm statute provides:

(c) As to a cause of action brought by any person arising from any of the acts enumerated in the section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply services or things in this State;

(3) Causes tortious injury in the State by an act or omission in this State;

(4) Causes tortious injury in the State or outside of the State by an omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State; . . . .[169]

Subsection (c)(1)-(3) and (5)-(6) are specific jurisdiction provisions, where there must be a nexus between the cause of action and the conduct of the defendant as a basis for jurisdiction.[170]  Subsection (c)(4) is a general jurisdiction provision, which requires a greater extent of contacts, but applies when the claim is unrelated to forum contacts.[171]

Section 3104(c)(1) requires some act on the part of the defendant occur in Delaware and plaintiff's claim arise out of that act.[172]  Section 3104(c)(2) provides that if

---

[168] *Reach & Assocs. v. Dencer*, 269 F. Supp. 2d 497, 502 (D. Del. 2003).

[169] *Round Rock Research LLC v. ASUSTeK Computer Inc.*, 967 F. Supp. 2d 969, 973-47 (D. Del. 2013) (quoting 10 DEL. C. § 3104(c)).

[170] *Monsanto Co. v. Syngenta Seeds, Inc.*, 443 F. Supp. 2d 636, 642 (D. Del. 2006).

[171] *Applied Biosystems, Inc. v. Cruachem, Ltd.*, 722 F. Supp. 1458, 1466 (D. Del. 1991).

[172] *Roquette Freres v. SPI Pharma, Inc.*, No. C.A. 06-540-GMS, 2009 WL 1444835, at *18 (D. Del. May 21, 2009).

a defendant's supplies or goods are shipped to Delaware, then the defendant must also perform the act in the state.[173]  Section 3104(c)(3) mandates that the tortious activity must have occurred in Delaware.[174]  To satisfy the requirements of § 3104(c)(1)-(3), "the conduct of the defendant must be directed at the residents of Delaware and the protections of Delaware laws,"[175] and "the mere placement of a product into the stream of commerce with an awareness that it may end up in a specific state is not enough to establish minimum contacts."[176]  Therefore, "when a foreign manufacturer designs, manufactures, labels and packages a product outside of Delaware, it has not performed those acts in the state and the specific jurisdiction provisions under § 3104(c)(1)-(3) do not apply."[177]

In the instant matter, there is no evidence of any act by Gong Luen, QM Taiwan, or Ebbenga that would subject them to personal jurisdiction under the long arm statute because the third amended complaint fails to establish any connection between them and Delaware.  Plaintiffs do not satisfy the requirements of § 3104(c)(1)-(3) because their complaint fails to allege, with reasonable particularly, that any act by these parties or any resulting tortious injury occurred in Delaware.  Plaintiffs, furthermore, fail to satisfy § 3104(c)(4) because they do not sufficiently show that Gong Luen, QM Taiwan, or Ebbenga derived any substantial revenue from any services or products consumed in

---

[173] *Id.* at *18-19 (citing *Moore v. Little Giant Indus., Inc.*, 513 F. Supp. 1043, 1046 (D. Del. 1981)).

[174] *Id.* at *19.

[175] *Id.* (citing *Thorn EMI N. Am. Inc. v. Micron Tech., Inc.,* 821 F. Supp. 272, 274 (D. Del. 1993).

[176] *Id.* (quoting *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 107 (1987)).

[177] *Id.* at *19.

Delaware.  The court, therefore, does not have specific or general personal jurisdiction over Gong Luen, QM Taiwan, or Ebbenga through Delaware's long arm statute.

The only means plaintiffs may establish personal jurisdiction is to meet the requirements of the conspiracy theory of jurisdiction and "assert specific factual evidence, not conclusory allegations, to show that the non-resident defendants were conspirators in some wrongful act resulting in harm to Delaware entities or their owners in order for the court to exercise jurisdiction over them."[178]  The conspiracy theory of jurisdiction is based upon the premise that the acts of a conspirator are imputed to all the other co-conspirators.[179]  A conspirator, therefore, who is absent from the forum, may be subject to jurisdiction if a plaintiff shows:  "(1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy."[180]  Subjecting nonresident defendants to jurisdiction based on the conspiracy theory comports with the notion of fair play and substantial justice because when a defendant voluntarily participates in a conspiracy with knowledge of its acts or effects in the forum state, he "can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits

---

[178] *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 978 (Del. Ch. 2000).
[179] *Instituto Bancario Italiano SpA v. Hunter Engineering Co., Inc.*, 449 A.2d 210, 225 (Del. 1982).
[180] *G & G LLC v. White*, 535 F. Supp. 2d 452, 464 (D. Del. 2008) (quoting *Instituto Bancario*, 449 A.2d at 225).

and burdens of its laws."[181]   However, "the specific factual allegations in a complaint that proposes to invoke the 'conspiracy theory' must be more than a 'facile way for [plaintiff] to circumvent the minimum contacts requirement.'"[182]   The test, however, is strict and is construed narrowly, requiring proof of each enumerated element.[183]

While plaintiffs allege a conspiracy existed to commit trademark infringement and conversion, and Gong Luen, QM Taiwan, and Ebbenga were parties to the conspiracy, plaintiffs fail to provide sufficient factual allegations that their wrongful acts resulted "in harm to Delaware entities or their owners" to allow this court to exercise jurisdiction over them.[184]   To satisfy the third element of the conspiracy theory of jurisdiction, plaintiffs are required to show "the actual occurrence . . . in Delaware of a substantial act or effect in furtherance of the conspiracy."[185]   For example, in *IOTEX Commc'ns., Inc. v. Defries*,[186] the court rejected the plaintiff's claim that a corporate director's breach of fiduciary duties owed to a Delaware corporation constituted a substantial act or effect since the breach occurred physically outside of Delaware.   The court reasoned that:

> In the case of Delaware corporations having no substantial physical presence in this State, an allegation that a civil conspiracy caused injury to the corporation by actions wholly outside this State will not

---

[181] *Christ*,  No. C.A. 06-275-GMS, 2007 WL 2022053 at *6 (quoting *Instituto Bancario*, 449 A.2d at 225).

[182] *G & G LLC*, 535 F. Supp.2d at 464-65 (quoting *Computer People, Inc. v. Best Int'l Group, Inc.*, No. C.A. 16648, 1999 WL 288119 at *16 (Del. Ch. Apr. 27, 1999)).

[183] *Werner v. Miller Technology Mgmt., L.P.*, 831 A.2d 318, 330 (Del. Ch. 2003).

[184] *Capital Invs. Group, Inc. v. Korban*, No. C.A. 10-115-GMS-SRF, 2014 WL 587363 at *9 (D. Del. Feb. 14, 2014) (quoting *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 5838328 (Del. Ch. Feb. 4, 2005).

[185] *Id.* at *9.

[186] No. 15817, 1998 WL914265 (Del. Ch. Dec. 21, 1998).

> satisfy the requirement found in the Supreme Court's opinion in
> *Instituto Bancario* of "a substantial effect . . . in the forum state."[187]

Plaintiffs offer no sufficient factual allegations that any substantial acts or effects of the conspiracy occurred in Delaware, and therefore, are unable to satisfy the third element. Plaintiffs' argument, that the acts of Gong Luen, QM Taiwan, and Ebbenga fulfill the third element because the Confidentiality Agreement between the defendants and QM contained a Delaware jurisdiction clause, is without merit.  Even though Ebbenga executed the Confidentiality Agreement (in his capacity as President of QM) and allegedly is the principal or alter-ego of QM Taiwan, there is no evidence that the agreement was signed in or has had any direct effect upon Delaware.  Plaintiffs' claim that Gong Luen, QM Taiwan, and Ebbenga conducted business in Delaware through the dispute resolution clause in the Confidentiality Agreement is premature because no dispute between the defendants and QM has arisen, whereby Delaware would be directly effected in resolving such dispute.  Jurisdiction is not established over these foreign parties since plaintiffs, Osco, a Pennsylvania corporation based in New Jersey, and EDI, a New Jersey corporation based in New Jersey, have not alleged any resulting harm or effect on Delaware businesses or entities.  Because plaintiffs are unable to satisfy the third element of the conspiracy theory of jurisdiction, the court need not analyze the remaining two requirements.

Since this court does not have personal jurisdiction over Gong Luen, QM Taiwan, and Ebbenga, counts six, seven, eight, nine, ten, and eleven against them are futile, and should be dismissed.

---

[187] *Id.* at *8.

### 2.   Collateral Estoppel and Res Judicata: Count 1 and 11 against Defendants

Collateral estoppel, or issue preclusion, prevents parties from re-litigating the same issues when a court of competent jurisdiction has previously adjudicated the case on its merits and a final judgment has been entered.[188]  A federal court, sitting in diversity in this Circuit, should not apply the federal law of collateral estoppel unless a substantial federal interest exists.[189]  If no federal interest exists, then the court looks to the rules of collateral estoppel of the state law that governs the second suit.  However, if the law governing the second suit adheres to the *Restatement (Second) of Conflicts of Laws* § 95 comment g, then the state law where the first judgment was rendered should be applied in the second suit.[190]  Section 95 comment g provides:

> The local law of the State where the judgment was rendered will be consulted to determine whether the parties should be precluded in a subsequent action upon a different cause of action from relitigating issues that were essential to the judgment and were actually litigated and determined by the judgment. The same law will determine such questions as whether a party will be held bound in a subsequent proceeding by an admission made by him in his pleadings in the original proceeding; whether a defendant will be precluded from raising in a subsequent proceeding issues that he could have, but failed to, assert in a counterclaim in the original proceeding; whether the rule of collateral estoppel applies to an issue which a party could not have had reviewed on appeal; whether, and to what extent, the rule of collateral estoppel applies to the decision of questions of law that were actually litigated and determined by the judgment; and whether the rule of collateral estoppel applies to an issue which was incidentally determined by the court but which the court would have had no jurisdiction to determine it.[191]

---

[188] *Witkowski v. Welch*, 173 F.3d 192, 198 (3d Cir. 1999).
[189] *Albanese v. Emerson Elec. Co.*, 552 F. Supp. 694, 698 (D. Del. 1982).
[190] *Id.*
[191] *Restatement (Second) of Conflict of Laws* § 95 (1971).

Delaware adheres to § 95 comment g and applies the state law of the previous suit to the issue of collateral estoppel.[192]  The four standard requirements for the application of collateral estoppel include:  "(1) the issue was identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a privity or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue."[193]  Mutuality of parties is not required, and "even though a defendant in the proceeding before the court was not a party to the earlier proceeding, Minnesota permits a defendant to invoke collateral estoppel in the subsequent litigation commenced by a plaintiff who also had been the claimant in the earlier proceeding . . ."[194]  Furthermore, collateral estoppel is not applied strictly.[195]  Once determined it is available, "the decision to apply the doctrine is left to the trial court's discretion,"[196] and must not be applied so rigidly as it would "work an injustice on the party against whom the doctrines are urged."[197]  The doctrine should be readily applied, however, "where parties have acquiesced in the verdict,"[198] and have failed to appeal the judgment.[199]

Res judicata, or claim preclusion, bars a party from initiating a second suit

---

[192] *Albanese*, 552 F.Supp. at 699 (citing *Bata v. Hill*, 139 A.2d 159 (Del. Ch. 1958)).

[193] *State v. Lemmer*, 736 N.W.2d 650, 659 (Minn. 2007).

[194] *Aufderhar v. Data Dispatch, Inc.*, 452 N.W.2d 648, 650 (Minn. 1990).

[195] *See Hauschildt v. Beckingham*, 686 N.W.2d 829, 837 (Minn. 2004).

[196] *Regents of Univ. of Minn. v. Medical Inc.*, 382 N.W.2d 201, 207 (Minn. Ct. App. 1986).

[197] *Hauschildt*, 686 N.W.2d at 837.

[198] *Ellis v. Minneapolis Com'n on Civil Rights*, 319 N.W.2d 702, 704 (Minn. 1982).

[199] *Bruner v. Klemp*, No. C1-95-2182, 1996 WL 208336, at *2 (Minn. Ct. App. 1996).

against the same adversarial party based on the same cause of action as in the first suit.[200]  When "the prior judgment has been entered on the merits, the scope and application of res judicata are determined by the law of the rendering state."[201]  Under Minnesota law, res judicata absolutely bars a subsequent claim when:  "(1) the earlier claim involved the same set of factual circumstances; (2) the earlier claim involved the same parties or their privies; (3) there was a final judgment on the merits; and (4) the estopped party had a full and fair opportunity to litigate the matter."[202]  Like collateral estoppel, res judicata is not applied rigidly and is invoked only after careful examination because it "may govern grounds and defenses not previously litigated" and may block "unexplored paths that may lead to truth."[203]

Whether counts one and eleven are barred by collateral estoppel and res judicata, and therefore futile will be addressed.  For count one, defendants contend plaintiffs are collaterally estopped from asserting the claim because the arbitrator previously determined that QM did not breach the Manufacturing Agreement, and plaintiffs, therefore, are unable to re-litigate the same issue and cannot satisfy all the elements of the claim.  To succeed on a claim for tortious interference with contractual relations, plaintiffs must establish:  "(1) a valid contract; (2) about which the defendants have knowledge; (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract; (4) done without justification; and (5) which causes

---

[200] *Dulhaney v. Attorney General of U.S.*, 621 F.3d 340, 347 (3d Cir. 2010).
[201] *Riverside Memorial Mausoleum, Inc., v. UMET Trust*, 581 F.2d 62, 66 (3d Cir. 1978).
[202] *Rucker v. Schmidt*, 768 N.W.2d 408, 412 (Minn. Ct. App. 2009).
[203] *Hauschildt*, 686 N.W.2d at 837 (quoting *Brown v. Felsen*, 442 U.S. 127, 132 (1979)).

injury."[204]  If collateral estoppel is applicable in this instant matter, then plaintiffs will be unable to prove the third element of the claim:  an act of the defendants caused QM to breach the Manufacturing Agreement with plaintiffs.

The four requirements for the application of collateral estoppel are met.  First, the same issue of whether QM breached the Manufacturing Agreement was already determined by the arbitrator.  Second, the arbitrator ruled on the merits of the dispute between QM and plaintiffs and found in favor of QM.  Third, Osco, a privity of EDI, was a party to the arbitration.  Fourth, plaintiffs had the opportunity to participate in the adjudication proceeding.  However, following the issuance of the arbitration judgment on March 11, 2014,[205] plaintiffs timely appealed on April 2, 2014, and moved to vacate the award in the District Court of Minnesota.[206]  Plaintiffs clearly have not acquiesced in the arbitrator's judgment and until the hearing on plaintiffs' motion to vacate is final, collateral estoppel does not operate.  Therefore, count one is not barred by collateral estoppel and is not futile.

For count eleven, defendants contend plaintiffs are precluded from asserting a claim of civil conspiracy due to collateral estoppel and res judicata because the arbitrator previously determined plaintiffs' evidence failed to show an act by QM that was responsible for depriving plaintiffs of their tooling and the Osco product.  In order to succeed on such claim, plaintiffs need to establish:  "(1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and

---

[204] *Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346, 357 (D. Del. 2006).

[205] D.I. 42, Ex. A.

[206] D.I. 47, Ex. K.

(3) actual damage."[207]  If collateral estoppel is available, then plaintiffs will be unable to prove the second element of their conspiracy claim.

The four requirements for the application of collateral estoppel are satisfied. First, the same issue of whether a wrongful act was committed in furthering a conspiracy and depriving plaintiffs' of their tooling and products was already determined by the arbitrator.  Second, the arbitrator ruled on the merits of the dispute between QM and plaintiffs.  Third, Osco was a party in the arbitration.  Fourth, plaintiffs had the full and fair opportunity to present their case during the proceeding.  In light of plaintiffs' appeal of the arbitration finding, at this stage, however, the court will not apply either collateral estoppel or res judicata.  Count eleven, therefore, is not barred by either doctrine.

### 3.    DUTSA and Count 11 against Defendants

To succeed on a claim for trade secret misappropriation, a plaintiff must establish the elements of DUTSA, 6 DEL. C. § 2001, in relevant part, as follows:

> (2) "Misappropriation" shall mean:
>
>> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>>
>>> 2.  At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade was:
>>>
>>>> B.  Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . [208]

---

[207] *Digene Corp. v. Ventana Med. Sys., Inc.*, 476 F. Supp. 2d 444, 446 (D. Del. 2007).
[208] *Mattern & Assocs., LLC v. Seidel*, 678 F. Supp. 2d 256, 269 (D. Del. 2010) (quoting 6 DEL. C. § 2001).

DUTSA, 6 DEL. C. § 2007 provides:

> (a) Except as provided in subsection (b) of this section, this chapter displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret.
>
> (b) This chapter does not affect:
>
> > (1) Contractual remedies, whether or not based upon misappropriation of a trade secret;
> >
> > (2) Other civil remedies that are not based upon misappropriation of a trade secret; or
> >
> > (3) Criminal remedies, whether or not based upon misappropriation of a trade secret.[209]

This court has previously found that § 2007 was intended to "make uniform the law with respect to trade secrets," and "preserve a single tort cause of action under state law for misappropriation . . . and thus to eliminate other tort causes of action founded on allegations of trade secret misappropriation."[210] Section 2007, therefore, preempts claims that are "grounded in the same facts which purportedly support the misappropriation of trade secrets claims."[211]  A common law claim "is grounded in the same facts as a trade secret claim if the same facts are used to establish all the elements of both claims."[212]  "If the success of the common law claim does not depend on the success of the trade

---

[209] *Overdrive, Inc. v. Baker & Taylor, Inc.*, No. C.A. 5835-CC, 2011 WL 2448209, at *4 (Del. Ch. June 17, 2011) (quoting 6 DEL. C. § 2007(a)-(b)).

[210] *Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 755 F. Supp. 635, 637 (D. Del. 1991).

[211] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 602 (Del. Ch. 2010) (quoting *Savor, Inc. v. FMR Corp.*, 2001 WL 541484, at *4 (Del. Super. Apr. 24, 2001)).

[212] *Accenture Global Servs. GMBH v. Guidewire Software Inc.*, 631 F. Supp. 2d 504, 508 (D. Del. 2009) (citing *Ethypharm S.A. France v. Bentley Pharmaceuticals, Inc.*, 388 F. Supp. 2d 426, 434-35 (D. Del. 2005)).

secrets claim, that is, if a plaintiff need not prove all the facts underlying the trade secrets claim in order to prove the common law claim, then the common law claim is not 'grounded in the same facts' and is not preempted."[213]  A determination of whether the information at issue constitutes a trade secret under DUTSA, however, does not need to be addressed before analyzing whether the claims must be displaced.[214]

In the instant matter, defendants assert that count eleven of civil conspiracy is pre-empted by § 2007 because in count five, plaintiffs claim defendants committed trade secret misappropriation in violation of § 2001.  To establish a claim of civil conspiracy, plaintiffs must prove the elements of "(1) a confederation or combination of two of more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damages."[215]  Also, "civil conspiracy is not an independent cause of action in Delaware, . . . it must arise from some underlying wrong."[216]  If "the factual predicate of plaintiffs' civil conspiracy claim mirrors the facts alleged to have constituted a misappropriation of trade secrets,"[217] then the claim will fail.  For example, in *Total Care Physicians, P.A. v. O' Hara*,[218] the court dismissed the plaintiff's civil conspiracy claim because it was based on the underlying wrongs that the defendants "blatantly violated Delaware

---

[213] *Id.*
[214] *Ethypharm*, 388 F. Supp. 2d at 433.
[215] *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1056-57 (Del. Sup. Ct. 2001).
[216] *Id.* at 1057.
[217] *Id.*
[218] 798 A.2d 1043 (Del. Sup. Ct. 2001).

law by misappropriating plaintiff's trade secrets, proprietary information, customer

lists and other proprietary information," which were very similar to the facts

alleged to support the plaintiff's misappropriation of trade secret claim, and relied

on evidence that the defendants misappropriated trade secrets, patient lists,

patient charts, and other information.[219]  In *Beard Research, Inc. v. Kates*,[220]

however, the court held the plaintiffs' breach of fiduciary duty claim was not pre-

empted by § 2007 because they could make the necessary showing of such

claim, even if their misappropriation of trade secrets claim failed.[221]

In the instant matter, plaintiffs' allegation of civil conspiracy is based on

the following underlying acts of defendants:  (1) to deprive plaintiffs of their

ownership of tooling and Osco products; (2) to remove Osco identifying marks

from Osco products and then sell them; (3) to misappropriate, use, and disclose

plaintiffs' trade secrets in violation of § 2001; and (4) to offer and sell Osco

products bearing the Osco trademark, thereby causing confusion, mistake, or

deception as to the source, affiliation, sponsorship, or authenticity of the goods

manufactured by defendants in violation of Section 43(a)(1)(A) and Section 32(1)

of the Lanham Act.[222]  For plaintiffs' claim of trade secret misappropriation under

count five, the alleged facts concern defendants' acquisition of plaintiffs' trade

secrets, customer lists, products sold to customers, pricing, and contracts, and

---

[219] *Id.* at 1052, 1057.
[220] 8 A.3d 573 (Del. Ch. 2010).
[221] *Id.* at 602.
[222] D.I. 42 at ¶¶ 217-223.

defendants' duty to maintain secrecy under the Confidentiality Agreement.[223]

Plaintiffs further allege under this claim, that defendants, in contravention of the

Confidentiality Agreement, misappropriated and disclosed this information to

QM.[224]  For count eleven, plaintiffs' third underlying claim or wrongful act alleging

defendants' misappropriation of trade secrets under § 2001 is similarly based on

the same facts being alleged in count five, and plaintiffs therefore, are pre-

empted from relying on this wrongful act to support their claim for civil

conspiracy.  Plaintiffs, however, have sufficiently alleged three other underlying

wrongs in count eleven, which do not substantially rely on the allegations set

forth in count five and could be proven independent of count five.  DUTSA

§ 2007 does not preclude the civil conspiracy claim because plaintiffs have

sufficiently relied on allegations of deprivation of tooling and product ownership,

removal of identifying marks and subsequent sale of products, and violations of

the Lanham Act.  Count eleven, is therefore, not futile.

### 4.    Counts 6 and 7 against Defendants

For counts six and seven, plaintiffs allege defendants committed

trademark infringement under 15 U.S.C. § 1114(1) and 15 U.S.C. § 1125(a) of

the Lanham Act, respectively.  In order for a plaintiff to prove either claim under

the Lanham Act, the following elements must be shown:  "(1) it has a valid and

legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the

---

[223] *Id.* at ¶¶ 159-161.
[224] *Id.* at ¶¶ 162-165.

mark to identify goods or services causes a likelihood of confusion."[225]

Defendants relying on § 1114(1), which states that "any person who shall,

without the consent of the registrant . . . shall be liable," and argue plaintiffs are

unable to succeed on these claims because they gave defendants the consent to

receive Osco product directly from QM Taiwan and then to sell it into the

marketplace.[226]  Defendants' argument, however, is misplaced because plaintiffs'

third amended complaint explicitly alleges they denied any request from QM to

sell Osco product directly to defendants.[227]  In accepting plaintiffs' allegations and

reasonable inferences as true, plaintiffs' sufficiently-pled assertions for violations

under the Lanham Act, adequately stating a claim for relief.  Count six and seven

against the defendants, therefore, are not futile.

## VI.     Order and Recommendation Disposition

Consistent with the findings contained herein,

IT IS RECOMMENDED that plaintiffs' motion for leave to file the third

amended complaint (D.I. 42) be granted in part and denied in part, specifically

1.)     Leave to amend counts 6, 7, 8, 9, 10, and 11 against Gong Luen,
QM Taiwan, and Mark Ebbenga be **denied** for lack of personal
jurisdication.

2.)     Leave to amend counts 1 and 11 against defendants be **granted**.

3.)     Leave to amend counts 6 and 7 against defendants be **granted**.

---

[225] *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).
[226] D.I. 45 at 15.
[227] D.I. 42 at ¶¶ 74-75.

Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), FED. R. CIV. P. 72 (b)(1), and D. DEL. LR 72.1, any objections to the Report and Recommendation shall be filed within fourteen (14) days limited to ten (10) pages after being served with the same.  Any response shall be limited to ten (10) pages.

The parties are directed to the Court's Standing Order in Non-Pro Se Matters for Objections Filed under FED. R. CIV. P. 72 dated October 9, 2013, a copy of which is found on the Court's website (www.ded.uscourts.gov.)

Date: June 24, 2014        /s/   Mary Pat Thynge_____
                           UNITED STATES MAGISTRATE JUDGE